THE STATE v. POLLARD, *Appellant.*

Division Two, May 25, 1897.

1. **Murder**: PROTECTION OF ONE'S HOME. A negro who is in his mother's house, which is also his home, however humble may be such home, has a right to protect it and himself and everyone in it against all intruders, and if he slays the intruder as he stands firing a pistol into the midst of the assembled family, the law declares his act justifiable homicide.

2. ———: MANSLAUGHTER. This being the case, the law can not be so inconsistent as to say that if such negro man, in an effort to protect himself and others of the family, gave the intruder a shove or blow while he was yet in the house and firing, that this would raise such a violent passion in defendant's breast as to reduce what would otherwise have been murder in the first degree to manslaughter in the fourth degree.

3. ———: SELF-DEFENSE. Neither courts nor juries are required to yield credence to the statements of a witness who, to save himself from justly merited punishment, challenges the array of all the other witnesses and all the physical facts in the case and then boldly invokes instructions based upon such simulated evidence; and an instruction touching self-defense, under such circumstances, should not be given.

4. ———: INSTRUCTIONS FOR MURDER IN THE SECOND DEGREE. Where the facts present a case of nothing less than murder in the first degree, no instruction should be given on murder in the second degree.

5. ———: SHOOTING AT ONE PERSON AND KILLING ANOTHER. It matters not that the defendant missed his mark and killed one man when he intended to kill another, because in such cases *the intention follows the bullet.*

6. Appellate Practice: MOTIONS: BILL OF EXCEPTIONS. Motions reciting certain matters as being facts in the trial of a case, are entitled to no consideration on appeal unless supported by the bill of exceptions. For this reason this court is precluded from noticing what is stated in the motion for a new trial about improper remarks of the prosecuting attorney, absence of the stenographer, etc., because such facts are not preserved in the bill of exceptions.

*Appeal from Buchanan Criminal Court.*—HON. R. E. CULVER, Judge.

AFFIRMED.

*P. Y. Brinton* and *Jno. A. Flornoy* for appellant.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) Objection to testimony can not be heard at this time from the fact that defendant failed to state reasons for the same at the time the question was put. A general objection is not sufficient to raise the question in motion for new trial or in this court on appeal. *State v. Hope*, 100 Mo. 347; *State v. Moore*, 117 Mo. 401; *State v. Nelson*, 132 Mo. 197. (2) The record does not show that defendant objected to the instructions given on the court's own motion at the time they were given. He is barred all right to object to them by motion for new trial or by making demand therefor in this court. *State v. Nelson*, 132 Mo. 196; *State v. Pollard*, 132 Mo. 294; *State v. Paxton*, 126 Mo. 500; *State v. Meyers*, 99 Mo. 107; *State v. McDonald*, 85 Mo. 542; *State v. Williams*, 77 Mo. 310; *State v.*

*Griffin*, 98 Mo. 674. (3) Defendant can not raise the point that the court failed to instruct on all points necessary when such questions on which instructions are not given are mere collateral matters. In that event it is defendant's duty to ask the instructions before he can take advantage of the court's failure. *State v. Murphy*, 118 Mo. 7; *State v. Clump*, 16 Mo. 385; *State v. Brooks*, 92 Mo. 542; *State v. Kilgore*, 70 Mo. 546; *State v. Leeper*, 78 Mo. 470. (4) Under the evidence defendant was not entitled to instructions on manslaughter in the first and third degrees. The court is not bound to give an instruction based upon the testimony of defendant when such testimony is in conflict with admitted facts. *State v. Bulling*, 105 Mo. 225. (5) The testimony of defendant that he did not intend to kill goes for nothing, where the evidence shows circumstances of great atrocity and cruel, blood-thirsty malignity, and no instruction need be given upon such testimony of the defendant. *State v. Brown*, 119 Mo. 527. (6) No exceptions were saved, as far as the record shows, of defendant's objections to jurors Swope, Prindle and Roedde. He could not be heard thereon in his motion for a new trial, and of course can not be heard in this court. (7) The record does not show that the stenographer absented himself from the court room during the argument of counsel, neither does it present a single instance where improper remarks were made by counsel for State; nor does it show that any objections were made to juror Cummings. Matters set out in the motion for a new trial do not prove themselves. The record must show all facts about which complaint is made.

SHERWOOD, J.—Murder in the first degree is charged in the indictment and the verdict supports that charge. Joseph Irvin is the person alleged to

have been murdered, and the murder is stated to have been committed by shooting with a pistol on the thirtieth day of July, 1895.

In the preceding August defendant, a negro, had made threats against David Irvin, another negro, and had attempted to kill him then, but was prevented. These threats were made to David Irvin, and also in his absence. Laura Mitchell, who, it seems, is defendant's aunt, and had "helped raise him," testified that in the preceding August defendant was at her house, and seeing David Irvin pass by going down the railroad, he said: "The d—d black son of a b—, I intend to kill him."

Between sundown and dark of July 30, before going to Irvin's, defendant called at Jennie Jackson's and told her that he was going down to see Dave Irvin; that he had heard through some white folks at Platte City that he had been talking about him. Jennie Jackson lived in the same neighborhood as did the Irvins.

On the evening of the day in question, about 8 o'clock, the lamps being lit, and when some of the family were eating and others had finished eating supper and all were seated, Laura Mitchell, who was seated at the open north door of the kitchen where the supper table was, when looking out of the door, saw defendant almost at the door and exclaimed: "Law, there's Jim Pollard."

Pollard, who had his coat thrown over or wrapped around his left hand, immediately stepped into the doorway and saying, "Dave Irvin, you are the very man I am looking for," pulled his revolver from out of his left hand where he had it concealed under his coat, and began firing at David Irvin, one of the shots narrowly missing David Irvin's head, who was sitting in a chair, and lodging in the door-facing at the south end of the room, some four feet from the floor. Joe

Irvin, a brother of David's, was then seated in a chair a short distance south from his brother. Firing the second time, defendant again missed his intended victim, and struck Joe Irvin "in the *goovel* of the neck" (as one of the witnesses expresses it) causing Joe's death in a few days thereafter. Upon the firing of the second shot, David Irvin sprang up from his chair, which was quite close to the door, knocked up defendant's pistol arm and ran out into the yard and northward toward and around the chicken house, defendant firing two more shots at him while he was running. After running around the chicken house, and thus escaping his pursuer, David Irvin ran around to the south side of the house and entered the south door there.

Meanwhile, defendant, foiled in his murderous design, fled and was not apprehended for some months afterward at Plattsburg in Clinton county.

· The testimony of Dave Irvin as to the occurrences at the house, is fully corroborated by four other witnesses who were present at the time, and substantially corroborated by them as to what occurred in the yard after the shooting in the house.

On his own behalf, defendant testified to a former difficulty with Dave, and that Dave had been making some threats about him, and in order to avoid having any trouble with him he left home in the spring, and was on his return the thirtieth day of July. He admitted that he saw Jennie Jackson just before he went to Irvin's, does not deny the statement she made as to what he said when there. He stated that he started the afternoon of July 30 to see his aunt, Laura Mitchell, who lived at Steele's; that he stopped a few moments at Jennie Jackson's; that on his way to Steele's from her house, when about half way between Steele's and Irvins, he looked back down in the

kitchen of Irvin's house, there was a light burning there, and there he saw his Aunt Laura sitting down right at the door, and so he turned around and went back down there; that just as he got to the door Dave, who was sitting there, "raised with a knife" and said "You little copper-colored son of a b— you, I will kill you," and struck at him (not with the knife) but with his fist, hit him on the breast and knocked him down; then they had a fight in the yard; that seeing he could not get out of the way as Dave had him down, he pulled his gun out of his pocket and shot, aiming to shoot up in the air, and shot merely to scare Dave off, and did not intend to kill anyone. He further testified, in response to a question from his counsel: "I went there in order to see my aunt, and I didn't want to have any bad feeling between Dave — and I didn't want to have any fuss, and I went there to see my aunt and if I seen him there to make friends with him. I had heard he had been making threats about going to kill me and I went there in order to make up."

Although he testified as to Dave having a knife in his hand and drawn on him, and although he testified that Dave had him down, yet he does not pretend that Dave made any attempt to use the knife on him.

Testifying on cross-examination, defendant denied that he had his coat on his arm; stated that his pistol was in his left hand pocket though he was not left handed; that when he went up to the door he spoke to his Aunt Laura and she spoke to him, when Dave, without speaking to him, rose up and rushed out of the door and hit him and knocked him down, when defendant, after trying to get away, shot in the air, and that he did not shoot in the house at all, nor with the intent to kill anyone. Subsequently testifying, defendant stated that he was *not* on the ground when he

shot, that he had to scramble up, and Dave ran him up pretty close to the fence when he turned and fired the only two shots he fired on that occasion, and they were fired in the air, and away from the house, and then Dave whirled, and as he whirled, defendant got over the fence and left.

The testimony of Dr. Lampson, who attended Joe Irvin, is to the effect that "the ball entered Joe's throat just below the Adam's apple and ranging outwards, downwards, and backwards, lodged about the middle of the shoulder blade." Just in the direction a shot would naturally go if fired by a person in a standing position at a person in a sitting posture. In such positions were both Dave and Joe Irvin, the latter being further south from the door and Dave being within a few feet of it, when defendant came to the door and began shooting down at Dave, as testified to by several witnesses who were there present. This is the substance of the evidence.

The trial court gave a number of instructions which it will not be necessary to notice in detail. Such instructions embraced murder in the first and second degrees, manslaughter in the fourth degree, and self-defense. As these instructions are in usual form, it is unnecessary to comment on most of them.

The second instruction is the following: "If you believe from the evidence that the defendant shot at David Irvin while in a violent passion, suddenly aroused by a shove or blow from said David Irvin, and that such shot took effect in the body of Joseph Irvin and killed him, then you will find defendant guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the penitentiary for two years," etc. This instruction is not based on the evidence. Defendant denies that he fired any shot in the house, and the testimony of all the other witnesses

shows that two shots were fired in the house before Dave sprang through the door, so that the supposed shoving did not occur until after the second shot was fired, which slew Joe Irvin.

But the instruction is erroneous on a far more serious ground. David Irvin was in his mother's house, and though it was the humble home of a negress, yet it was as much under the protection of the law as the proudest mansion in the land. Being in his home, David Irvin had the right to protect it and himself and everyone in it against all intruders, and had he slain defendant when he stood firing his murderous pistol in the midst of that assembled family, the law would have declared his act justifiable homicide. *Morgan v. Durfee*, 69 Mo. 469.

This being the case, the law can not be so inconsistent as to say that if David Irvin, in the effort to protect himself and others of the family, gave defendant a shove or blow that this would raise such a violent passion in defendant's breast as to reduce what would otherwise have been murder in the first degree to manslaughter in the fourth. In a word, the exercise by David Irvin of a strictly legal right could not, in legal contemplation, arouse a violent passion in his intended slayer nor mitigate that slayer's crime to the paltry grade of manslaughter.

No instruction touching self-defense should have been given; there was none in the case. Against the self-contradictory statements of defendant are the testimony of five concurring witnesses who were present in the house at the time of the shooting, as well as the physical facts of the bullet wound in the neck of deceased and the bullet found in the door-facing only four feet from the floor, as well as the denial of defendant that he fired any shots in the house and his final

admission that he fired only two shots and they were fired close to the yard fence and away from the house.

Heretofore we have said, and we have frequently repeated the observation, that neither courts nor juries are required to yield credence to the statements of a witness who, to save himself from justly merited punishment, challenges the array of all the physical facts in the case, and then boldly invokes instructions based upon such simulated evidence. *State v. Anderson*, 89 Mo. *loc. cit.* 332; *State v. Gilmore*, 95 Mo. *loc. cit.* 565; *State v. Bryant*, 102 Mo. 24; *State v. Turlington, Ib. loc. cit.* 663; *State v. Nelson*, 118 Mo. *loc. cit.* 127; *State v. Brown*, 119 Mo. *loc. cit.* 538, and numerous other cases.

For like reasons as above no instruction should have been given on murder in the second degree. The facts preserved of record present a case of nothing less than murder in the first degree. And it mattered not that defendant missed his mark and killed Joe Irvin instead of Dave, because in such cases the *intention follows the bullet.*

No exceptions were saved to these instructions, and of course defendant could not take advantage of them, however erroneous they might have been. But attention has been called to them in order to condemn the errors pointed out.

Nor were exceptions even saved as to the ruling of the court as to certain jurors. Motions reciting certain matters as being facts in the case are entitled to no consideration unless supported by the bill of exceptions; in a word, statements in motions do not prove themselves, as we have so often decided. For this reason we are precluded from noticing what is stated in the motion for a new trial about improper remarks of the prosecuting attorney, absence of stenographer, etc., etc.

Finding no error in the record except error in defendant's favor, we affirm the judgment and direct the sentence pronounced by the law to be carried into execution. All concur.