## THE STATE v. FRAGA, Appellant.

Division Two, November 20, 1906.

1. **SELF-DEFENSE: Defendant's Testimony: Instruction.** Where defendant's own testimony shows that he had taken the gun away from the deceased, and that when he shot her she was making no effort to get possession of it and had no weapon in her hands, he is not entitled to an instruction on self-defense.

2. ———: ———: **Contrary to Physical Facts: Instruction.** Where defendant's testimony that he shot the deceased in

self-defense is clearly irreconcilable with the physical facts connected with and surrounding the homicide, the defendant is not entitled to an instruction on self-defense, and under the evidence in this case the court properly refused to give such an instruction.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster,* Judge.

AFFIRMED.

*Claiborne & Shaner* for appellant.

The court failed to instruct the jury on the law governing self-defense. This the court should have done, even though there was no testimony to justify such instruction except that of the defendant alone. State v. Palmer, 88 Mo. 573; State v. Partlow, 90 Mo. 626; State v. Banks, 73 Mo. 592; State v. Brown, 104 Mo. 373; State v. Hollingsworth, 156 Mo. 178; State v. Fredericks & Langan, 136 Mo. 51.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

The court did not err in failing to instruct the jury on the law of self-defense. (1) "The law of self-defense is the law of necessity. Taking life cannot be justified and is not justifiable when it can be safely avoided." Kelley's Crim. Law & Prac., sec. 517. "Self-defense is an affirmative, positive, intentional act," and it must appear that the slayer believed that in order to avoid the danger it was necessary for him to take the life of the deceased. State v. Gilmore, 95 Mo. 554; State v. Dettmer, 124 Mo. 426; State v. Tabor, 95 Mo. 585; Kerr's Law on Hom., sec. 180, p. 203; 25 Am. and Eng. Ency. of Law, 258. (2) "When witnesses attempt to establish a certain theory by their testimony, they must first look to it well that their testimony must not go counter to the physical facts in the case; for if it does, neither courts nor juries are re-

quired to stultify themselves by disbelieving the immutable physical facts in the case, and so we have said on a number of occasions.'' State v. Turlington, 102 Mo. 642; State v. Bryant, 102 Mo. 24; State v. Anderson, 89 Mo. 332; State v. Nelson, 118 Mo. 124; State v. Nocton, 121 Mo. 537; State v. Hancock, 148 Mo. 488; State v. Pollard, 139 Mo. 220.

BURGESS, P. J.—Under an information duly filed by the circuit attorney of the city of St. Louis, in the circuit court of said city, charging the defendant with murder in the second degree for shooting to death with a pistol one Julia Lamm at said city on the 2nd day of October, 1904, the defendant was found guilty of the offense charged and his punishment fixed at imprisonment in the penitentiary for ten years. He appeals.

The facts as stated by the State are substantially as follows:

Defendant, Charles Fraga, at the time of the homicide, was living in a rented room in the rear of the basement of a rooming house at 3216 Locust street in said city of St. Louis. This house was then being conducted by Mrs. Maggie S. Hardin as a rooming house. The defendant had moved to this room on the 4th of August next preceding and had been living there about two months. When he rented the room he told Mrs. Hardin that he had a wife, and on Monday next before the homicide, he asked her if his wife could come there to live. Mrs. Hardin gave her consent and on Wednesday of the same week Julia Lamm, the deceased, whom the defendant represented to be his wife, moved her property into the defendant's room and came there to live. The deceased was not defendant's wife, but was a woman whom he had known for two years and who had frequently visited the defendant at his room before she came there to live. About half

past ten o'clock Saturday night, October 2, 1904, a light was seen burning in the defendant's room. Mrs. Harding, the landlady, was sleeping that night in the room directly above the defendant's room, and a guest, Mr. Downing, was sleeping in one of the other rooms in the basement. About one o'clock Mr. Downing was awakened by what he thought was a shot, and he thinks he heard at the same time a woman scream. Two more shots were fired in succession and then there was an interval of two or three minutes. Then there were two more shots in succession followed by another interval of about five minutes. During this second interval, a person was heard opening the outside door and striking matches. Then there was a sixth shot; this was followed by a silence of several minutes. Then someone was heard calling. The shots and the movements of the person in the basement were heard by Mr. Downing and Mrs. Harding and each got up to see what was the matter. The police were called and the defendant was found lying in the door leading from his room into the adjoining room, the greater part of his body being in the latter room. He was calling, "Help! Help!" The light was burning low in the defendant's room, and the deceased was found lying across the bed, on her right side, dead. Her clothes were on and her feet were hanging over the side of the bed and nearly touching the floor. She was holding a letter in her right hand, which letter was offered in evidence.

The defendant was taken to the hospital, and found to be suffering from three pistol shot wounds on the breast near the left nipple, the wounds being not over an inch apart. In each of two of the wounds the bullet had struck a rib and was deflected around the body and lodged in the back. The bullet making the other wound broke away a part of the rib and pierced the lung. The first two wounds described were not serious, and though the defendant, when taken to the hos-

pital, was suffering from a shock, the effect of the third wound, which wound was of a serious character, he soon recovered, and was able to leave the hospital in about a month. The post-mortem disclosed three bullet wounds on the body of the deceased, two of which were necessarily fatal, and either of which would have caused almost instant death. One wound in the chest, and midway between the middle line of the breast bone and the left nipple, was powder stained, and contained particles of powder. The bullet which made this wound passed entirely through the heart and lodged near the spinal column. The second wound was found on a line drawn straight down from the arm pit on the left side at a point below the sixth rib. This bullet passed from left to right into the chest, passed through the lower part of the left lung and embedded itself in the spinal column. The third bullet entered the head at the juncture of the ear with the head at a point over the left temple bone. This bullet passed directly through what is called the temple lobe of the brain and embedded itself in the middle part of the skull below the temple lobe, in which place it was found. The two wounds last described were not powder burned. A person receiving such a wound as the deceased received in the heart, according to the testimony, would drop immediately, and the wound in the breast was also fatal, and would probably cause the deceased to drop when she received it. The deceased was lying as if she had been sitting on the edge of the bed and had dropped back on her right side, with her head towards the head of the bed and the feet hanging towards the floor. The lighted lamp was found on the table right in front of the bed and a revolver was lying on the same table open, or what is called "broke." There was one empty shell in the revolver, and the extractor had jumped over the cartridge so that the shell could not be gotten out or the revolver closed; and it was shown

by the evidence that such a revolver was liable to get in that condition by having only one cartridge in it at the time it was discharged. One empty shell was found on the table and three on the floor, making in all five empty shells. On the dresser was found a sheet of paper, on which the defendant had written a note, stating that he had been shot by Julia Lamm. In the right hand of the deceased was found an envelope containing a letter which was partly out of the envelope. This letter, which was offered in evidence, was from N. Castulo, Camp of Philippine Scouts at the World's Fair, and requested the woman to meet the writer at the date stated. The room in which the homicide occurred was a very small room; it contained a washstand, upon which stood a pitcher of water; a table, on which stood the burning lamp; and a dresser, together with a bed and trunk, leaving little more than enough room for two people to pass. Nothing in the room indicated that any struggle had taken place.

The defendant was a witness in his own behalf and testified that the woman, Julia Lamm, who had been out during the day, came to his room that night shortly before the homicide in an intoxicated condition; that a quarrel arose because of her conduct, and because of a letter the defendant had found in her absence, addressed to her in the name of Julia Miller; that the deceased got the revolver from the dresser and shot the defendant three times, and he fell to the floor and became unconscious; that he soon regained consciousness, and was suffering greatly from his wounds, and wanted a drink of water; that he saw the deceased in front of the dresser as though reloading a revolver; that he went to the washstand to get a drink, and saw the revolver in the deceased's hands, reached for it and got hold of her arm; that a struggle then followed over the possession of the revolver in which one shot was accidentally fired; that the defendant then got the revolver away from the deceased, and in his own language,

"Without thinking any more I just passed the revolver from the left hand to the right and pointed at her and fired two shots;" that he saw her fall towards the bed, and he fell to the floor, where he lay for some time, but finally got to the foot of the bed and got a towel to put on his wounds, and took a drink of water from the pitcher; that he then went to the dresser, opened the drawer and got a tablet on which he wrote the note offered in evidence, stating that he had been shot by Julia Lamm.

As a witness in his own behalf the defendant was asked the following questions by his counsel, and gave the following answers:

"Q. Now, had you made any motion to hurt her in any way before she fired that shot? A. No, I did not have any time to.

"Q. When you got the gun away from her, and did shoot her, why did you shoot her, for what purpose? A. Because I knowed if she got hold of that gun she would kill me—shoot me again.

"Q. Because you thought she was going to kill you? A. Yes, sir."

The court instructed on murder in the second degree, manslaughter in the fourth degree, presumption of innocence and reasonable doubt, but did not instruct on self-defense. Defendant excepted to all of the instructions and to the failure of the court to instruct the jury on all the law governing the case.

Among the grounds assigned in the motion for a new trial and the only ones insisted upon in this court for a reversal of the judgment are the 6th and 7th, which are as follows:

"6th. The court erred in not properly instructing the jury on the law governing the evidence in the case.

"7th. The court failed to instruct the jury on the law governing self-defense."

As it is not suggested in the 6th ground, however, in what particular the court erred in not properly in-

structing the jury on the law governing the evidence in the case, but it is asserted in the 7th ground of the motion that the court failed to instruct the jury on the law governing self-defense, we assume that they both have reference to the same thing; that is, the failure of the court to instruct upon self-defense. Upon this theory of the case defendant insists the court should have instructed even though there was no evidence to justify such an instruction except that of the defendant alone. The question therefore is, was defendant entitled to such an instruction upon his own version of the homicide? In State v. Dettmer, 124 Mo. 426, Sherwood, J., in passing upon the right of the defendant to an instruction upon self-defense, held that he was not, saying: "The right of that nature is not to be invoked unless all other means fail; it is the *dernier ressort*, and in order to justify a homicide on the ground of self-defense, the doer of the homicidal act must have done everything in his power, consistent with his safety, to avoid the danger and to avert the necessity; and he must retreat, if retreat be practicable. [Kerr's Law of Hom., sec. 180, p. 203, and cases cited; State v. Gilmore, 95 Mo. 554.]"

If it is true, as defendant testified, that a quarrel took place between himself and deceased; that the deceased got the revolver from the dresser and shot him three times, and he fell on the floor and became unconscious; that he soon regained consciousness, saw deceased in front of the dresser as though reloading the revolver, saw it in her hands, reached for it and got hold of her arm; that a struggle then followed over its possession, in which one shot was fired; that he then got the revolver away from the deceased and without thinking any more just passed it from his left hand to his right and pointed at her and fired two shots, and saw her fall towards the bed, it is inconceivable how defendant could have shot the deceased in self-defense, or, in other words, how he could have been afraid she

would take the gun from him, which he had just taken from her, and kill him, when at the time he shot her he had the weapon in his own hands.   Nor is there any reason disclosed by the record why defendant could not have withdrawn from the room when the shooting occurred, after he had gotten the pistol in his own hands, and thus escaped any apprehended danger; but rather than do so he changed the pistol from his left to his right hand, pointed it at deceased who was then unarmed, making no effort to assault him, and fired two shots and saw her fall, and now claims to have acted in self-defense in shooting and killing her.   If he shot her twice as soon as he changed the pistol from his left to his right hand, without thinking any more, he did not shoot as claimed, because he had no good reason to believe that deceased was then about to assault him with the pistol or do him some great bodily harm, which was absolutely necessary in order to justify him in shooting her in defense of his person.

The evidence, in our opinion, conclusively shows that defendant did not shoot the deceased in self-defense.   Moreover, the matters testified to by defendant as a justification for shooting and killing the deceased are clearly inconsistent with the physical facts.   There can be no question under the evidence but that the first three shots were fired by the same person, for they were fired in rapid succession and out of the same pistol, for there was no evidence that there was any other pistol used.   The evidence shows that there were six shots fired and that three of them took effect upon the deceased and three upon the defendant.   There were but five chambers in the pistol, and it must of course have been reloaded after the first shot was fired.   According to the defendant's testimony, after he regained consciousness and before the last three shots were fired he saw the deceased in front of the dresser as if reloading the pistol.   Under the facts and circumstances the pistol could not have been reloaded by the deceased.

No empty cartridges were removed from the pistol after the last shot was fired, only one empty cartridge was found in the pistol, and as three shots were fired after the time defendant testified that the deceased reloaded the gun, and as two of the wounds received by the deceased were fatal and must have produced almost instant death, it is perfectly clear that the deceased did not reload the gun. Besides, there was an interval between the fifth and sixth shots. Between the two last shots a person was heard moving about in the room, striking matches and opening the door, and immediately thereafter the sixth and last shot was fired. The only logical conclusion to be deduced from these facts is that the defendant, after killing the deceased, shot himself with the two remaining loads and afterwards placed the sixth cartridge in the pistol and fired the sixth and last shot. No struggle was shown to have occurred preceding the homicide. The character and location of the wounds received by the deceased, the position of the body when found lying on the bed on her right side holding a letter in her right hand as if she had been sitting on the side of the bed reading it, and when shot had fallen back on the bed in the position that she was in when found, almost conclusively shows that the deceased was killed by the three first shots. These facts are clearly inconsistent with defendant's account of the homicide and irreconcilable with the theory that the homicide was committed in self-defense. For this further reason defendant was not entitled to an instruction upon the ground of self-defense. [State v. Hancock, 148 Mo. 488; State v. Pollard, 139 Mo. 220; State v. Brown, 119 Mo. 527; State v. Nelson, 118 Mo. 124; State v. Turlington, 102 Mo. 642; State v. Gilmore, 95 Mo. 554.]

Our conclusion is that the judgment should be affirmed. It is so ordered.

All concur.