STATE of Missouri, Respondent,

v.

Harry James CHAMINEAK, Appellant.

No. 47229.

Supreme Court of Missouri,

Division No. 2.

Oct. 12, 1959.

Morris A. Shenker, John E. Bardgett, Lawrence J. Lee, Bernard J. Mellman, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Robert E. Hogan, Sp. Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

A jury found that Harry Chamineak, in shooting and killing Harold Hogan, was guilty of murder in the second degree and fixed his punishment at ten years' imprisonment. Numerous problems have been briefed and argued but the meritorious question, determinative of this appeal, is whether Chamineak is entitled to a new trial because the court refused to instruct the jury upon the subject of self-defense, a question of law "arising in the case" and "necessary for their information" (V.A.M.S., Sec. 546.070), if there is any evidence in the record from which self-defense could be found. State v. Bidstrup, 237 Mo. 273, 140 S.W. 904; State v. Davis, 342 Mo. 594, 116 S.W.2d 110. The state does not challenge the general rule and the court's duty; the state contends that there was no "substantial evidence" of self-defense. Specifically, the state contends that Chamineak's testimony, from which a jury could have found self-defense, was "so inconsistent with the physical facts disclosed by the record that the Court was not obliged to accept it as substantial evidence."

In so far as they have some bearing on self-defense only, these were the circumstances: Hieatt Hogan operated a restaurant at 6727 Lillian Avenue, Jennings, in St. Louis County, and his brother, Harold Hogan, was employed there as the "fry cook." Harold had once been married to Harry Chamineak's present wife, Agnes. Chamineak and Agnes were not married, however, until after Harold's death. At the time of the shooting Chamineak lived in the basement at 4226 Pleasant Avenue, in the City of St. Louis, Agnes lived on the first floor, and her mother and stepfather, Sam Bass, lived on the second floor. While Harold and Agnes were married they too operated a restaurant and, according to Agnes and Sam Bass, Harold left Agnes and the restaurant and failed to pay certain taxes due the government, the consequence being that some agent of the government was asserting a lien on Agnes' property, presumably the property at 4226 Pleasant Avenue. Because of the taxes Agnes was anxious to communicate with Harold, but neither she nor Sam Bass knew where he then lived or worked. Hieatt thought that Harold and Chamineak had had "some trouble," but Hieatt did not know Chamineak and had never seen him until March 1, 1958.

On that date, Mrs. Bass having gone to Florida, Sam, Agnes and Harry left home about 6:30 o'clock and went to a neighborhood restaurant, "The Basket," in Harry's automobile. There they each had a bottle of beer. After supper they went to a drugstore and Sam bought some personal toilet articles, including a safety razor, and a case of beer. On the way home Sam asked Harry to drive him out to Lillian Avenue and Jennings Road so he could find out whether Harold was working there. They took Agnes home and put the case of beer on the back porch. Agnes took a "sleeping tablet," went to bed and did not hear the shooting several hours later. Sam and Harry then drove out to Hieatt's restaurant in Jennings, arriving about nine o'clock. Harold was not there, but according to Hieatt, Sam created a disturbance in the restaurant and threatened him with the safety razor, in which Sam said there was no blade. Chamineak did not say anything offensive and did not threaten or challenge anyone in the restaurant. Not finding Harold, Sam and Chamineak left the restaurant and returned to 4226 Pleasant Avenue where they watched television in the first-floor quarters until eleven o'clock. At that hour Sam left Chamineak, still watching television, and went to bed and to sleep on the second floor and did not hear any noise until awakened by the police some time later.

About eleven o'clock Hieatt, Harold and their friend, Steingrubey, met at a tavern in Jennings, they were there an hour or

an hour and a half and had four drinks. They then went to Steingrubey's filling station and he cleaned out the cash register and picked up a revolver. The revolver was not loaded and he says that he did not show it to the Hogans and Hieatt says that he did not know it was there. He laid the gun down on the floor of the back seat of Hieatt's automobile and the three of them in the front seat, with Hieatt driving, started out at 12:45 looking for Sam Bass in order that Hieatt might warn Sam to stay away from his restaurant. They drove to a tavern at Grand and Florissant but Sam was not there, then they drove to another tavern and Hieatt went in alone but did not find Sam. Incidentally, a defense witness who was acquainted with Harold—the owner-bartender of the "Cosmopolitan Bar," 2006 East Grand Avenue, said that Harold and a larger man (presumably Hieatt) came into his establishment looking for Sam Bass about 12:30 and he "seen a handle of a gun there," in Harold's belt. As they rode down the street Harold said, "Let's go down here on Pleasant. I know where he lives."

Hieatt drove west on Pleasant and parked opposite 4226 but down the street, "a door or two." He then went to the door on the first floor and knocked, Chamineak says "a loud knock," and asked for Sam Bass. Chamineak told him that Sam was not there but said that he, Chamineak, would come out and talk to them. Hieatt returned to his automobile and reported to Harold and Steingrubey, "He's coming out." But instead of waiting Hieatt drove around the block and at this point, thinking there might be some trouble, Steingrubey got in the back seat and when they returned Hieatt was in the driver's seat and Harold was sitting on the right side in the front seat with the window down. While the Hogans and Steingrubey were driving around the block, Chamineak got his shotgun from the basement stairway and when they returned,

according to Hieatt and Steingrubey, he appeared at the rear of the automobile, "asked my brother if he was looking for trouble, and my brother told him no," raised the shotgun to his hip and shot Harold as he sat, unarmed, facing the windshield. And, as Hieatt got out of the driver's seat and stood on the pavement, Chamineak fired a second shot, the pellets striking Hieatt in the shoulder. Hieatt got back in the automobile and again drove to Steingrubey's filling station where Steingrubey called the police. The police went to 4226 Pleasant Avenue, awakened Sam Bass and took Chamineak, Agnes and Sam to the police station.

Chamineak said that when he responded to the loud knock at the door Hieatt had the storm door open and was leaning against it with his back, "and he had his hand down back beside him." Hieatt asked for Sam Bass but Chamineak told him that Sam didn't live there. At that moment Hieatt recognized Chamineak and he said, " 'Oh, yes, I remember you. You were out at the restaurant tonight. * * Well, you will do, come on out.' And I said, 'Man, you are drunk or crazy.' I said, 'Get out of here. I don't want no trouble with you guys.' * * * He said, 'You are coming out, or I am coming in after you.' * * * I said, 'If you want it that way, if it's got to be that way, I will be out in a couple of minutes then.' " He says that he started to call the police but looked back over his shoulder and Hieatt was watching him through the door and he went to the stairway to get his shotgun but heard the storm door slam and when he got to the door there was no one there, he looked outside and the automobile was gone. He put his shoes on and was going to bed when he heard screeching tires and when he looked out this time he saw "the same car sitting about the same place." He says that he returned to the stairway and was loading his shotgun when he heard a car door slam. He walked out the front

door and saw Hieatt standing on the left side of the parked automobile, the motor running, and he said, "I was walking up behind the car and I went over to the passenger's side of the car—before I got there I asked them, 'What do you guys want with us for?' I said, 'Why do you want to harm us?' I said, 'We didn't ask for no trouble. Why don't you guys get out of here?' And about that time I got around to where Harold was sitting, and I didn't know it was Harold until I looked in and seen him, and at that time Hieatt said, 'Now is your chance, Harold,' and by that time Harold had one leg on that drive shaft that goes through the center of the car, and he come up with that pistol and, as he did that, I dropped back with my shotgun and leveled it and pulled the trigger." Incidentally again, Steingrubey says that when Chamineak came around the side of the car "some words passed between Chamineak and Harold Hogan" and that at that time, as to whether Harold was looking at Chamineak, he said, "Sort of in a way, yes, he had his head turned a little bit." On cross-examination Chamineak said, "I jumped back and lifted the gun up when I seen he had a gun in his hand." When he fired his gun was pointed in a southeasterly direction and Harold was facing the windshield, south, and he conceded that when he jumped back and fired he was behind Harold.

A post-mortem examination of Harold revealed "a shotgun wound of entrance posterior to the lobe of the right ear. There was a wound of exit in the left orbital fossa." At the morgue the police found a leather blackjack sticking out of Harold's left pants pocket. Police officers also found the unloaded pistol in Hieatt's automobile but they found no ammunition for it. The state points to all the circumstances and specifically to the fact that Chamineak approached the automobile from the rear, the fact that Harold was right-handed and was facing the wind-

shield, the fact that no loaded gun was found in the automobile and none on Harold's person, the fact that the course of the shotgun pellets was from back of his right ear to his left eye and argues that there was "no substantial showing" of self-defense and, therefore, no duty on the court to instruct the jury on the subject. Recognizing, as a general rule, that the credibility, weight and probative force of evidence is for the jury's determination, the state invokes the rule frequently employed in civil cases that evidence which is inherently impossible or in conflict with indisputable physical facts or the laws of nature is not sufficient to support the essential issue and take the case to the jury. (The Missouri civil cases are collected in 88 C.J.S. Trial § 208(g) (5), p. 441 and 8 A.L.R. 796, 798.) The state argues that the circumstances of this record fall within that rule; specifically, it is contended that Chamineak's "evidence of self-defense * * * is so inconsistent with the physical facts disclosed by the record that the Court was not obliged to accept it as substantial evidence."

It is not now necessary to consider the precise function of the rule, or to examine its rationale and limitations, or even to consider its applicability in criminal cases; its applicability is assumed even though it is doubtful that any criminal case involving self-defense has in point of fact turned alone upon the rule. State v. Baker, Mo., 277 S.W.2d 627, 630, turned on the inconsistency of the defenses of accident and self-defense, particularly (and, only, it may be added) when the "defendant relies upon his own testimony as a basis for the inconsistent defenses." Likewise, State v. McGee, 361 Mo. 309, 234 S.W.2d 587, 591, did not involve evidence contrary to the physical facts; in that case there was no imminent danger or self-protection, "The testimony falls far short of a submissible issue of self-defense." The homicide cases, together with their dates, in which the doctrine of

evidence contrary to the physical facts is discussed in connection with self-defense, often incidentally and collaterally, are State v. Pollard, 1897, 139 Mo. 220, 40 S.W. 949; State v. Hancock, 1899, 148 Mo. 488, 50 S.W. 112 and State v. Fraga, 1906, 199 Mo. 127, 97 S.W. 898. But it is not necessary to examine the soundness of these decisions or to determine whether they necessarily and in fact turned on the application of the doctrine; there was not present in those cases the comparable background in which Chamineak's conduct must be viewed, and the testimony and its permissible inferences in those cases, if not the undeniable physical facts, immediately distinguishes them from this record and Chamineak's testimony. It is not essential to a disposition of this appeal to again repeat the testimony relating to self-defense and consider its weight and credibility or point out all the permissible inferences; it is sufficient to say that the evidence is not demonstrably contrary to the physical facts or inherently impossible. If the testimony is not contrary to the physical facts the state concedes that the evidence supports the defense and, as indicated in the beginning, if supported demanded an appropriate instruction. State v. Forsythe, Mo., 251 S.W.2d 17; State v. Finn, Mo., 243 S.W.2d 67; 41 C.J.S. Homicide § 375, p. 163.

Because of the court's refusal to in any manner instruct the jury upon the subject of self-defense the defendant is entitled to a new trial; accordingly the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.