STATE of Missouri, Plaintiff–Respondent,

v.

Velma M. GARDNER, Defendant–Appellant.

No. WD30926.

Missouri Court of Appeals, Western District.

Sept. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1980.

Application to Transfer Denied Nov. 12, 1980.

Holliday & Holliday, David A. Koester, Harold L. Holliday, Jr., Kansas City, for defendant–appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for plaintiff–respondent.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

DIXON, Judge.

Defendant was indicted for second degree murder of her husband and was convicted by a jury of manslaughter. The jury imposed a sentence of one year in the Jackson County Department of Corrections.

The defendant wife appeals asserting error in the State's cross -examination of defendant and argument thereon which the defendant claims inferred a duty to retreat. The admission of two color photographs of the deceased husband is also challenged.

Defendant and her deceased husband had been married for 29 years at the time of the shooting on October 2, 1977, and had lived at the scene of the shooting, 5262 Lawn in Kansas City, for the last 14 years of the marriage.

Defendant wife testified that her husband was a "wife beater," that he was "non-social," that he drank "all the time," and that he had a quick temper. Others confirmed that he beat his wife and that he was a "heavy drinker" who was "quick tempered."

The husband had been admitted to the hospital in late 1976 for alcohol abuse and was diagnosed as a chronic alcoholic. After treatment, he was released, but continued to drink heavily. Drinking eventually cost him his job of 32 years in late August or early September of 1977.

During 1976 and 1977, the wife was employed as a maintenance worker at Midwest Research Institute, working about 20 hours a week. While working at Midwest, she met Charles Lowe, who was also a maintenance worker and rode to work with him. The wife confided in Lowe about her domestic problems, to the extent that Lowe became practically her sole confidant in these matters. This acquaintanceship continued during 1977 after Lowe was not a

co–worker. The wife and Lowe had lunch, conversed on the phone, and made trips to Omaha and Sedalia. These trips were not overnight trips, and others were involved in the group. The wife and Lowe denied intimacy before the killing.

The husband was at home after he lost his job, and the abuse of the wife increased. The wife filed for divorce in August, 1977. Beginning in September, the wife and Lowe were together more frequently. On an occasion when they were together, they encountered Doris Hogan who shouted at the wife to "leave Lowe alone."

Hogan was thoroughly discredited as a witness which the State conceded, the defense even offering a witness who testified Hogan attempted to tamper with the witness during trial. As it appears hereafter, Hogan's testimony relates only to the possible relationship between the wife and Lowe and does not affect the basic issues of this appeal.

Hogan apparently out of jealousy, went to the husband and detailed her suspicions of the behavior of Lowe and the wife. This precipitated a brawl between Hogan, the husband, and the wife. As a result the wife left, after police were called, and stayed with her daughter.

The wife then learned from her husband that he was armed and she remained at her daughter's until her husband agreed to surrender a rifle if she returned. The rifle was at that point in her car. All these events then culminated in the two days of Friday and Saturday that led to the killing.

On Friday, the husband attacked the wife in bed at home, hitting and trying to choke her. This attack apparently stemmed from conversations the husband had with Hogan.

The next morning, October 1, 1977, the wife called Lowe and related the attack of the night before, and Lowe came to defendant's house. Lowe brought a .25 caliber Beretta semi–automatic pistol, stating, "You better learn how to protect yourself, because somebody's going to get killed." Lowe took her to a wooded area that afternoon and taught her how to operate the pistol.

On their return, wife and Lowe met the husband driving the wife's car. The wife took her car and the husband went with Lowe. The husband and Lowe drank beer at Lowe's that afternoon, and Lowe called the wife to tell her to look for the rifle in the trunk of her car, where she found it. The wife then took the rifle to Lowe's mother's house.

Later that afternoon, Lowe and the husband picked the rifle up at Lowe's mother's and went to husband's and wife's house where they all ate together. After supper, Lowe returned the rifle to the husband after unloading it in the presence of the wife. The husband promised to return it to the owner, Huey Dunn. However, the rifle did not belong to Dunn, rather the husband had taken it without permission from his son -in law.

After the husband left to return the rifle, the wife called Huey Dunn to find out if the rifle had been returned and found that it had not. It was at this time, when the wife and Lowe were both in the house, and Lowe's car was in the garage with the door shut, that husband kept driving by the house.

The husband came to the front door and tried to get in. The wife denied him entry into the home. The husband tried to enter the backdoor, was unsuccessful, and finally broke in a garage window and entered the house.

Lowe and the husband scuffled, Lowe subdued him and ordered him out of the house. He left, but returned shortly to ram the garage door with his car. The wife called the police, but the husband was gone upon their arrival at 12:03 a. m. The police instructed Lowe to leave, and he did leave after they did, but not before giving the wife the pistol she had learned to use earlier in the day. The police also told the wife to lock her door and call them if her husband returned; they would arrest him.

What occurred thereafter is known only through the testimony of the wife.

Within a few minutes after Lowe left, the husband returned and again rammed the garage door with his car, causing extensive damage to defendant's car and the washer and dryer in the garage.

The wife then left the house, carrying the pistol, went down the first flight of steps to the driveway, and stopped. The wife stated that the husband attempted to run her down with the car, although the physical evidence (lack of tracks) did not support this claim. The husband again rammed the garage door, and the wife stepped off the steps and went around behind the car to the driver's side.

The wife had the gun in her right hand, out of sight, and she begged her husband to leave. The husband said, "I'm going to kill your mother fucking ass," while at the same time "reaching down" and opening the car door. At this point, the wife shot her husband.

The wheels immediately started turning on the car and spun hard and long enough to completely destroy the right rear tire and leave the rim resting on the pavement; it also caused a lot of smoke. The wife went into the house and called Lowe and then the police, she then returned to the car and unsuccessfully attempted to pull her husband out.

The fire department responded, but not before the wife called Lowe again to tell him the car was burning.

The physical evidence revealed that at least five shots were fired from the pistol; four of the bullets were found in the car, and one was found in the husband's clothing at the morgue.

An autopsy revealed that the husband was struck by three bullets, one entering the left forearm and passing completely through the chest area (this was the fatal wound) one entering the left shoulder and exiting the right side of the face, and one entering the left middle back area.

An examination of the car at the scene revealed that all doors except the passenger side front door were open, as was the trunk. The car extended 6'4" into the garage, the keys were in the ignition, the car was in drive, but it was not running. The husband was slumped over towards the passenger side with his left hand on the steering wheel, his right leg on the accelerator with the rifle (unloaded) laying next to his right arm. The husband was dead at the scene.

The defendant's first claim of error is that the State was improperly permitted to cross–examine the defendant regarding her actions in advancing into the driveway instead of retreating into the house. The argument, first, is that this cross–examination suggested that the defendant had a duty to retreat contrary to the law. This duty being implied, the defendant further suggests that this amounted to a comment on the law by the prosecutor not embodied in a written instruction.

It is important to note that aside from the implication of the questions and answers there was nothing before the jury as to the theory on which they were posed. The comments by the State, that the evidence was offered on the issue of retreat, were out of the hearing of the jury. The questions were addressed to the proximity of the defendant to the door of the house and the admitted fact that she did not reenter the house.

Thus, the first ground offered by the defendant of error in the cross–examination rests upon a dubious premise. That dubiety arises both from the defendant's assertion as to the law and the inference the defendant draws that the evidence bore solely on retreat.

■ The defendant asserts in her argument with respect to the law that a duty to retreat is part of the law of Missouri, *citing* State v. Fraga, *199 Mo. 127, 97 S.W. 898 (1906). More recent authority also supports the proposition that retreat, when possible with safety, is a duty required before resorting to deadly force.* State v. Roberts, *242 S.W. 669 (Mo.1922);* State v. Young, *510 S.W.2d 732 (Mo.App.1974). That such a retreat is not required beyond the threshold of the defendant's home is established.* State v. Brookshire, *353 S.W.2d 681 (Mo.*

1962). *However, as* Brookshire *notes, the defense of the home concept is as to entry only; and, when entry has been accomplished, the case then stands on traditional self–defense grounds. Nor does* State v. Neria, *526 S.W.2d 396 (Mo.App.1975) change these principles, as the defendant suggests. It is true that* Neria *reiterates the holding of* Brookshire–*that the defendant in his own home need retreat no further; but this does not cover the facts of the instant case. The defendant in the instant case was admittedly outside her home. What the defendant's argument amounts to is that the duty of retreat is satisfied by presence in the curtilage and not the house proper.*

The notion that the common law defense of habitation, which may have included the curtilage, is part of Missouri law is expressly negated by *Brookshire, supra* at 690, and *State v. Lawrence,* 569 S.W.2d 263, 265 (Mo. App.1978).

Thus, the defendant's argument that she was under no duty to retreat under Missouri law simply is not consistent with the decided cases.

■ Nor is the inference that the cross examination implied only a duty to retreat a valid one. The objection on the ground of retreat was in reality an objection to relevancy. No objection could have been made as to competency or materiality. The cross-examination was relevant on the issues of necessity for the use of fatal force, the fact of aggression, and the necessary inference of deliberation to find the submitted issue of second degree murder.

The argument that the cross-examination required the court to give an instruction on the law of retreat is likewise unavailing. The trial court gave MAI–Cr 2.40 as offered by the defendant. It was as favorable as the facts would permit–perhaps too favorable to the defendant. The defendant requested no other instruction, and the facts of this case do not require speculation as to whether "retreat" is a "non–element" which should not be engrafted on MAI–Cr 2.40. *State v. Phillips,* 583 S.W.2d 526 (Mo. banc 1979).

■ The second point in the defendant's brief is that it was error to *permit* the prosecutor to argue the issue of the defendant's failure to stay in the house as bearing upon the issue of retreat. The difficulty with the contention is that it asserts error not properly preserved. The argument is clearly directed to the "necessity" for the killing. No request is made for plain error review, and no such review is necessary. *State v. Smith,* 355 Mo. 59, 194 S.W.2d 905 (1946) is a case in which the argument was remarkably similar, and the defendant failed to object; the court found no error. The failure to object to argument generally waives the error. *State v. Davis,* 448 S.W.2d 892 (Mo.1970).

■ Defendant, in the final point, contends two color photographs of the deceased were improperly admitted because of their inflammatory nature.

It was the State's theory that the wounds indicated the deceased was not reaching for a weapon but was raising his left arm in a protective gesture. There was testimony of the physician who performed the post–mortem as to the location of the wounds and the probable angles of entry and exit. This theory necessarily rested upon the location and angles of entrance and exit of the bullets. The photographs complained of served as aids to the jury in explaining, clarifying, and corroborating this testimony.

■ A photograph is admissible if it tends to prove any material element of the State's case, *State v. Jackson,* 499 S.W.2d 467 (Mo.1973). Understanding of facts, corroboration, explanation, and clarification of testimony will likewise make photographs admissible, even if shocking and otherwise inflammatory. *State v. Stevens,* 467 S.W.2d 10 (Mo.1971); *State v. Jones,* 594 S.W.2d 932 (Mo.1980); *State v. Wood,* 596 S.W.2d 394 (Mo. banc 1980).

The judgment and conviction are affirmed.

All concur.