(No. 32317.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BERNICE DAVIS, Plaintiff in Error.

*Opinion filed May 22, 1952—Rehearing denied September 10, 1952.*

GEORGE N. LEIGHTON, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, WILLIAM BRUMLIK, J. V. SCHAFFENEGGER, RUDOLPH L. JANEGA, JOHN M. BREEN, JR., and RICHARD E. DOWDLE, all of Chicago, of counsel,) for the People.

Per CURIAM: The defendant, Bernice Davis, was indicted by the grand jury of Cook County, on two separate charges of murder. After trial before the court without a jury in cause No. 50-1289, defendant was found guilty of the murder of one Edward T. Crowley and sentenced to death by electrocution. It was then stipulated that the evidence in cause No. 50-1290 would be the same as that in 50-1289, whereupon defendant was also found guilty of the murder of Donald E. McCormick and the same sentence pronounced. The causes are here upon writs of error to review the record of the trial court.

Since one of the assignments of error relates to the legal sufficiency of the evidence to sustain the convictions, we shall first direct our attention to the facts adduced at the trial.

Both deceased individuals were members of the Chicago police department. They were plain-clothes officers assigned to the robbery detail under the direction of sergeant John J. Hanrahan. On July 13, 1950, the Chicago police department received a telephone call from the chief of police of Weirton, West Virginia, stating that a robbery had been committed there and that the robber was known to have called by telephone the number Taylor 9-8321 in Chicago. He requested that the Chicago police investigate. Sergeant Hanrahan assigned officers Crowley, McCormick, and Patrick Driscoll to the investigation. The officers found that the telephone number given was listed to one Bernice Davis at 2343 West Maypole Avenue. On July 14, 1950, the three officers went to that address expecting to interview a woman named Bernice Davis. They arrived there about 2:15 P.M. and parked their squad car on the north side of West Maypole Avenue across the street from number 2343 which was a two-story building located on the south side of the street. Defendant, Bernice Davis, lived in the second-floor apartment of this building with his wife, Dolores, and their infant daughter. Officer Driscoll remained with the police car and officers Crowley and McCormick crossed the street together. After ringing a doorbell they were admitted to the building by Barbara Washington, a cousin of the defendant, sixteen years of age.

All members of the Davis family were at home at the time the officers arrived. The defendant, hearing the bell and voices, looked out a window toward the street. He saw the policemen and the police car parked across the street. He recognized it as a squad car because of its long radio aerial and its peculiar type of bumper guards. He

also noticed that one officer remained in the car. Defendant had been implicated in a series of robberies, and, fearing that the police had come to arrest him, he hid in a clothes closet off the living room of his apartment.

Barbara Washington, having admitted the officers, who stated they wanted to talk to Bernice Davis, called upstairs to Dolores and asked her if Bernice was in. Dolores made some response after being called a second time. Barbara told her there were some men to see her and she said, "OK," whereupon the officers went upstairs where they were admitted to the living room by Dolores Davis.

The officers, still believing that the person they wanted to question was a woman, asked Dolores if she were Bernice. Upon being advised that she was not Bernice, the officers asked her if a person by the name of Bernice lived there and she told them that no woman by that name resided at that address. She also made evasive answers about telephone calls. One of the officers began to look about, and, opening the closet door discovered the defendant in the closet partially clothed. He ordered the defendant to come out and clothe himself. Defendant stated that he was Dolores' "boy friend" and had stopped to see her for awhile. He denied knowledge of the phone call in question. Officer Crowley noticed a slip of paper near the telephone with the words "Steubenville, Ohio" on it. Apparently realizing that Steubenville was near Wierton, West Virginia, the officers told defendant and Dolores Davis that they would have to go to the police station for questioning.

Mrs. Davis had prepared to accompany the officers and was standing in the living room near the baby's crib with her back toward the men. She was conscious that some conversation was occurring between her husband and the officers but paid no attention to it and does not remember any of it. The defendant sat at one end of a couch, officer Crowley at the other end and officer McCormick stood near the door leading to the hallway. This was the only

regular exit from the apartment. Defendant states that officer Crowley had his revolver drawn. At a time when officer Crowley turned to speak to McCormick, defendant suddenly reached into the corner beside the couch and picked up a fully loaded 38-calibre revolver with which he first shot and killed officer McCormick and then killed Crowley. Crowley wounded the defendant in the right knee after defendant had shot McCormick. All shots were fired after the defendant, upon drawing his gun, commanded the officers not to move. Defendant stated that he reached for the gun in question because he feared he was being arrested for the robberies he had committed. Defendant testified that McCormick fired the first shot; that he then shot McCormick, following which he emptied his revolver at Crowley. After being shot, Crowley attempted to grapple with the defendant and the defendant then struck Crowley over the head several times with his revolver until Crowley fell to the floor.

Davis, after securing a number of live cartridges for his gun, fled through a bathroom window at the rear of his apartment and thence by a succession of progressively lower roofs to the alley behind the building where he reloaded his weapon. He states that he did this because he feared the other officer, who had stayed with the car, might try to stop him. On Washington Boulevard the defendant, still armed, found one Lawrence Breckenridge seated in an automobile. Defendant forced his way into this car at gun point and commanded Breckenridge to drive. Defendant put Breckenridge out of his car at a point near Jackson Boulevard and a cross street. Defendant then drove to 1080 West Fourteenth Street where he parked the car in an alley at the rear of a building in which his mother-in-law lived on the second floor. He first went to the second-floor apartment, but looking out a little later he saw police officers in the neighborhood, armed with various weapons, so he went up to the third-floor apartment of one Evelyn

Tibbs, where he forced his way in and hid in a bedroom closet. There he was arrested by police officers at about 6:15 P.M. on the day of the shootings. At the time of his arrest defendant told arresting officers he had thrown his gun away, but it was found fully loaded in the closet where he had been hiding. Defendant had a number of live cartridges in his pockets at the time.

From the location of his arrest defendant was taken to the Maxwell Street police station and from there to the State's Attorney's office in the Criminal Courts Building, arriving at about 7:20 P.M. There he was given food and examined by two doctors. One of the doctors gave his wound first-aid attention and administered a tetanus shot. Both doctors found that defendant was in good physical condition other than for the wounded knee and that his head and body showed no marks of violence. Defendant's statement as to the shooting occurrences and the circumstances surrounding them was taken in the library of the Criminal Courts Building at 10:13 P.M. Questions were asked of the defendant by one assistant State's Attorney; the questions and defendant's answers were taken in shorthand and later transcribed. The statement as transcribed was then read to the defendant while he had a copy in his hand. Defendant later denied reading the statement, but it is undisputed that he turned the pages as the statement was read to him. Defendant signed this statement and initialed each page. Present at the time the statement was taken and signed were three civilian witnesses, including a colored minister, two assistant State's Attorneys, one colored and one white, a police officer and the shorthand reporter. The interrogation itself was of about one hour and fifteen minutes duration. Prior to the interrogation defendant was advised that the statement would be used against him and that he did not have to answer the questions unless he wanted to. According to at least one of the

civilian witnesses, defendant stated that he desired to make the statement.

Counsel for defendant has argued six assignments of error. Only those argued will be considered, since those assigned but not argued are deemed to have been waived. *People* v. *Smith,* 404 Ill. 125.

Defendant contends that the homicides were justified because committed in defense of his habitation. The statutes of this State define justifiable homicide as follows: "Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, * * * against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein." (Ill. Rev. Stat. 1949, chap. 38, par. 366.) The record discloses that at the time of the shootings the police officers were already inside the dwelling of the defendant. Admission had been gained in an orderly and peaceable manner and without the slightest use of force or intimidation. Personal violence was not used nor was it threatened. It appears from the testimony of defendant's wife that just prior to the shooting some conversation was going on between the officers and her husband in the same room in which she stood but it was of such quiet and ordinary character that she does not remember what was said. She further testified that the conduct of the officers did not cause her to become excited and that the officers at no time threatened harm or injury.

Defendant, according to his own statements, both at the trial and on the date of his arrest, suddenly seized his revolver from beside the sofa and ordered the officers not to move. The shootings followed. Defendant says he seized his gun because he feared arrest and sought to prevent it. The record, we believe, falls far short of demon-

strating that the killings occurred while defendant was in the necessary defense of his habitation.

Counsel for defense rely on the cases of *People* v. *Eatman,* 405 Ill. 491, and *People* v. *Lavac,* 357 Ill. 554. In the *Eatman case* the deceased and a woman accompanying him sought to force their way into defendant's apartment with the view of evicting defendant and his wife for non-payment of rent. Their efforts included a violent assault on the defendant with a flashlight. In the ensuing melee, defendant seized a knife from the top of a refrigerator and with it killed his assailant. In the *Lavac case* two officers intending to serve a warrant came to the back door of the defendant's home in the nighttime and beat upon it. There was an inner door and also an outer storm door. Defendant could not see those outside and did not know they were officers. He inquired who they were and was told to open the door or they would break it in. Defendant shot the officers through the door. There was also evidence that hoodlums had been active in the neighborhood and that defendant knew of this. In both cases discussed, we held that the killings were justifiable homicides. The facts of those cases are not even remotely like those in the case now before us. There is not the slightest evidence here that the officers forced their way into defendant's dwelling in a riotous or tumultuous manner. At the time of the shootings they were already in the apartment engaged in a normal and peaceable conversation with the defendant. The defendant knew they were officers and what their business was. Nor does the conduct of the defendant after the shootings square with a defense of justifiable homicide. Had the defendant killed in necessary defense of his habitation as counsel contend, there was no need for his fleeing the scene, nor can such a contention be reconciled with the commission of an armed robbery by the defendant in his desperate effort to elude possible pursuit. Defendant surrendered to the police only when traced to his hiding place

and forced to come out. This is not the conduct of the outraged citizen who has been compelled to use deadly force in the defense of his dwelling. We believe the trial court was clearly right in holding that the defense of justifiable homicide was not established.

We have carefully examined the record in connection with defendant's second contention that the court erred in admitting in evidence the statement of the defendant made on the day of the shootings. The grounds of objection are that the statement was not voluntarily given and that defendant, because of his physical condition, was not able to make a statement which can be regarded as trustworthy or reliable.

We believe that a reading of the statement itself is the best refutation of the latter part of the objection. The answers made to the questions are intelligent, direct and positive. There is no indication whatever that the defendant was distracted by pain or that his mind was diverted in any way from the business at hand. The detail in the answers, the volunteering of information not sought, and the clear recollection of events of some months past indicate a mind functioning in an orderly fashion. Added to this is the testimony of the witnesses who saw the defendant at the time of, and just prior to, the taking of the statement. The doctors who examined him and rendered first aid for his wounded knee stated that except for that injury he was in good condition. He was given food and insisted on sitting at a table to eat it. The witnesses who were in the room when the statement was given indicated that defendant was aware of the nature of the proceedings and understood and answered questions readily.

Considering the remaining part of this objection, the evidence does not indicate that the statement was obtained by threats, promises, force or violence. Defendant contends that he was beaten at the time of his arrest by certain of the arresting officers and by other officers when he was

in the patrol car being transported from the Maxwell Street police station to the State's Attorney's office. He also testified that the officers in the patrol car made threats as to what would happen to him if he failed to co-operate. All officers who were with him at the times and on the occasions he mentioned appeared and emphatically denied that any threats were made by them, or by either of them, or by anyone in their presence. The two physicians who examined defendant after his arrival at the State's Attorney's office found no marks of violence on defendant. One of these physicians did not testify at the trial, but a witness who was present at the examination testified that this doctor, after carefully examining defendant, stated to the defendant that there were no marks on him other than the wound in his knee. The other doctor, who examined defendant later, stripped defendant to the waist and found no marks or bruises on defendant's head or body. Several lay witnesses also testified that they saw no marks or bruises on defendant. Defendant's testimony that he was beaten is not corroborated in any way by any testimony or any of the surrounding facts and circumstances.

The statement was given by the defendant in the presence of three civilian witnesses, one of whom was a pastor of his own race. The questioning was not prolonged. Questions were asked by only one person. No more persons were present than necessary to safeguard the rights of the People and those of the defendant and to insure the reliability of the statement when made.

Defendant relies, in this connection, upon the case of *People* v. *Thomlison*, 400 Ill. 555. In that case the defendant was delivered to the police unmarked and the next morning appeared with eyes discolored, face bruised, split lips and teeth loose. Six witnesses who saw him testified to his condition. A confession was obtained from him while being held and he testified that certain police officers used force and violence to secure his statement. The offi-

cers denied this but we held that the confession was inadmissible, the physical condition of the defendant showing more clearly than any testimony what had happened. In the case now before us there is no proof whatever of any marks of violence upon the defendant. Not even defendant testified that there were any marks or bruises on his person. We believe that the statement was freely and voluntarily given and that it was properly received in evidence by the trial judge.

Complaint is also made that the court received the confession or statement without deleting therefrom mention by defendant of the robberies he had committed prior to the day of the shootings. While motive is not an element of the crime of murder necessary to be proved by the People, it is always proper to show the presence of a motive which would lead the accused to commit the act charged. (*People* v. *Mangano,* 375 Ill. 72.) Evidence of the commission of other crimes will be received only when it tends to establish the crime for which the defendant is being tried. It must meet the same tests of relevancy and materiality as other evidence. We have held that evidence of other crimes may be admissible to prove design, motive or knowledge where these matters are in issue or relevant. (*People* v. *Watkins,* 309 Ill. 318.) In the latter opinion, we observed, at page 322: "Where the motive for the crime charged is the concealment of some other crime, either by destroying the evidence of such other crime or by killing a witness who could testify to it or by bribing or killing an officer who is attempting to arrest the offender, the evidence of such motive is admissible even if it does show the commission of an extraneous crime."

In the case now before us, the defendant, in the course of giving his statement, volunteered the information relative to the robberies in which he had participated in the spring of 1950. He further stated that he hid in the closet because he feared the officers were coming to arrest him for

those robberies. He says that he drew his gun because he feared arrest and incarceration. In view of the fact that the defense of justifiable homicide by reason of defense of habitation was interposed at the trial, it seems clear that those parts of defendant's statement mentioning the robberies became relevant and material to the issues and were, therefore, admissible, though they tended to prove the commission of other crimes. They were relevant and material because they demonstrated that the defendant shot to escape arrest rather than to defend his habitation as contended at the trial.

Closely allied to the objections just discussed, is the assignment of error predicated upon the reception of formal proof of a record of conviction of the defendant of the crime of armed robbery in the State of Kentucky in 1947. While the proof of the commission of other crimes not connected with or tending to establish the commission of the crime charged generally cannot be received, it is the rule that where a defendant testifies in his own behalf his prior conviction of an infamous crime may be introduced in order to impeach his testimony. At common law one convicted of an infamous crime was not a competent witness. This rule has been abrogated by statute in Illinois, but such conviction may be shown as affecting his credibility. (Ill. Rev. Stat. 1949, chap. 38, par. 734.) The proof in the trial court was properly received and met the requirements heretofore outlined by this court for proof in such cases. *People* v. *Lane,* 400 Ill. 170; *People* v. *Buford,* 396 Ill. 158.

Defendant complains that the calling of his cousin, Barbara Washington, as a court's witness, deprived defendant of a fair trial and the use of a witness valuable to the presentation of his case. It appears that a proper foundation was laid for calling Barbara Washington as a court's witness. When interrogated on the date of the occurrence, Barbara gave the assistant State's Attorney a

written statement. In it she did not say that the officers who had visited the apartment building that afternoon represented themselves as water inspectors in gaining admission. Counsel for defendant in opening statements at the trial stated that she would testify that the officers made such representations. Defense counsel also claimed in its opening statements that Barbara Washington had been intimidated by the counsel for the People and concealed by them since the case began. At the trial and before Barbara was called as a witness, counsel for the People, observing that Barbara was related to the defendant, lived in the same house with him, and had been coming to court with other relatives of the defendant, requested that she be called as a court's witness. The record shows that defense counsel were then asked if they had any objections, and one of them stated that they had none, provided that they had the right to question her. The court assured counsel that this right would be preserved.

We find no error in the calling of Barbara Washington as a court's witness under these circumstances. She was examined at length by counsel for both sides and by the court. The trial judge made every effort to assure himself that the witness had not been subjected to intimidation or promises by either side. The witness reported to the court that she understood her position and was under no fear or apprehension in testifying. The witness told the same story and told it without hesitation. She admitted that she did not at first tell the State's Attorney that the officers had represented themselves as water inspectors simply because she did not recall it at the time, but she was very positive at the trial that they had so represented themselves at the time. It thus appears that the defendant received the full benefit of Barbara's testimony. So far as we can see from the record, the question as to whether or not the officers had made such statements to Barbara was the only disputed point in her testimony. It appears to us that at

best it was a collateral issue of little importance. The record shows that such representations, if made, were not passed on by Barbara to the Davises, and such representations, if made, played no part in securing admission to the Davis apartment. Even if such representations were made and had played a part in securing such admission, this could have afforded no comfort to the defendant, because, according to his own statement, he drew his gun on men he knew were police officers to prevent their arresting him.

We come, finally, to the contention that the evidence as a whole does not establish the guilt of the defendant beyond a reasonable doubt. The record in this case contains 1258 pages and we have given it that careful attention which a case of this importance merits. We shall not attempt to review all of the testimony here. The conviction in this case does not depend in any way upon circumstantial evidence. The evidence for the People was direct and positive and included, in addition to defendant's statement, proof that the bullets causing the deaths were fired from defendant's gun, proof of admissions by defendant to the witness whose car he commandeered after the shootings, and proof of flight and hiding following the occurrence. In our opinion this evidence establishes the guilt of the defendant of the crime charged beyond a reasonable doubt.

The judgments and sentences of the criminal court of Cook County are, therefore, affirmed, and said sentences shall be executed on the seventeenth day of October, 1952. The Clerk of this court is directed to enter an order to that effect and furnish a certified copy of such order to the sheriff of Cook County at least ten days prior to the date of execution.

*Judgments affirmed.*