THE STATE v. A. W. GOODWIN, Appellant.

Division Two, May 29, 1917.

1. **SELF-DEFENSE**: Instruction: Necessary to Kill. Instructions on self-defense which tell the jury that if defendant at the time he struck and killed deceased "had reasonable cause to believe and did believe that it was necessary for him to strike and kill," and

that "you must find and believe from the evidence that the defend-ant not only thought he was in danger of being killed, but that he had reasons to believe that he was in danger of being killed or receiving great bodily harm," etc., are erroneous. Said instruc-tions condition defendant's right to self-defense upon his belief that he was in danger of being killed and upon the presence of a reasonable ground for believing it necessary to kill.

2. ———: **The Rule.** The rule of self-defense is that a defendant has the right to defend himself and use such force as is necessary for the purpose, not only if he believes he is about to be killed, but if he believes he is in danger of receiving great personal injury, provided he has reasonable cause for so believing. Where under the evidence the jury might readily find that defendant was nei-ther afraid of being killed nor believed it necessary to kill, but had reasonable cause to believe and did believe himself in danger of being "beat up," he had the right of self-defense and to use no greater force than was necessary to protect himself from that danger, and instructions which told the jury that it was neces-sary for him to believe he was in danger of being killed and must have had reasonable grounds for so believing took away that right.

3. **DEFENDANT AS WITNESS: Unwarranted Cross-Examination: Re-buke of State's Attorney.** The mere sustaining of objections to a cross-examination of defendant concerning matters entirely out-side the scope of the examination in chief may not be a sufficient protection of defendant's rights. Persistent and violent cross-examination of the defendant, especially the injection of inquiries concerning his moral turpitude disconnected from the issues, which was the course pursued in this case, require a severe rebuke of the prosecuting attorney.

Appeal from Dunklin Circuit Court.—*Hon. W. A. C. Walker,* Judge.

REVERSED AND REMANDED.

*Bradley & Bradley* for appellant.

(1) The court erred in giving the instruction for the State on the subject of self-defense. (2) The court erred in permitting counsel for the State to continue ask-ing leading questions in an endeavor to get before the jury incompetent matter. State v. Beckner, 194 Mo. 281; 2 Wigmore on Evidence, secs. 891, 992, 924; State v. Sibley, 131 Mo. 519; State v. Pollard, 174 Mo. 607. The court erred in not rebuking counsel for the State for ask-

State v. Goodwin.

ing incompetent questions and then withdrawing them. See authorities last above; State v. Baker, 262 Mo. 689; State v. Webb, 254 Mo. 414. (3) The court erred in permitting counsel for the State to interrogate the defendant on cross-examination, repeatedly and time and again about matters concerning which the defendant was not asked on direct examination. R. S. 1909, sec. 5242; State v. Pfeifer, 267 Mo. 23; State v. Grant, 144 Mo. 56; State v. Hathhorn, 166 Mo. 239; State v. Hudspeth, 150 Mo. 31; State v. Bell, 212 Mo. 111; State v. Cook, 112 S. W. 712; State v. Sharp, 233 Mo. 284.

*Frank W. McAllister,* Attorney-General, and *S. E. Skelley,* Assistant Attorney-General, for the State.

(1) This instruction on self-defense is not prejudicial or misleading and is in form approved by this court. State v. Gee, 85 Mo. 650; State v. Parker, 106 Mo. 224. (2) The court committed no error in not rebuking counsel for the State for asking incompetent questions. State v. Moreaux, 254 Mo. 398. (3) The court committed no error in the cross-examination of the defendant. (a) The questions to which objections were overruled were properly based on matters gone into in the defendant's direct examination. (b) Where objection was sustained by the court the error, if any, was not sufficiently prejudicial to constitute reversible error.

WHITE, C.—The appellant was found guilty of manslaughter in the fourth degree in the circuit court of Dunklin County, at the October Term, 1915. He was charged with killing one Robert M. Baskin. The affair took place at a logging camp of the Wisconsin Lumber Company, located on a spur track near a station known as Converse, on the Deering-Southwestern Railroad. The defendant was woods foreman of the lumber company, having general charge of the camp and of the men employed there. Baskin, the deceased, was one of the men employed and his duty was to scale logs. Baskin was a young man whose age was variously placed at from twenty to twenty-three years by the witnesses. Goodwin

was a man of forty-five years of age, and had a wife and large family living at Deering.

The defendant had an office, combined with a sleeping apartment, in what is termed his "car," a building constructed in the shape of a box car, made so that it could be loaded upon a flat car and moved from place to place. In the camp it was set upon blocks about three or four feet high. This car was eight or nine feet wide and eighteen or twenty feet long. Goodwin had his office in one end of the car and his bed in the other end, there being a partition between the two parts. A porch extended along the end occupied as his office, and a door and two windows opened upon this porch, as also a door and two windows opened at the other end of this car. The car sat along-side the spur track and about eighteen or twenty feet from it. Forty or fifty yards away, and on the other side of the track, was what was called the "boarding house." It consisted of two or three cars similar to Goodwin's car, set together in such a way as to be convenient for its purpose. On that same side of the spur track, and a little distance away, was Baskin's car, where he kept a desk and also a bed where he slept.

The difficulty leading to the homicide took place in the forenoon of June 15, 1914, in the front part of Goodwin's car, where he had his desk. On that morning a young woman by the name of Vena Biggs, who formerly had been employed at the boarding house, was visiting the camp and went to Baskin's car, where she was sitting on the side of his desk engaged in a conversation with him when observed by Goodwin. There was some indication in the testimony that the character of this Vena Biggs had been questioned, and Goodwin, as he claimed, in the discharge of his duties as foreman of the camp, directed or requested Mrs. Kennedy, who conducted the boarding house, to call Vena Biggs away from Baskin's car. She did so. The girl came immediately to the boarding house, followed by Baskin, who inquired whether Goodwin had directed Mrs. Kennedy to call her. Upon receiving an affirmative answer, without comment of any kind, he went toward Goodwin's car.

It appears from the evidence that Baskin's connection with the company was about to be severed, whether by his own acts or whether he had been notified he would be discharged does not appear.  At any rate it is apparent that he entertained very strong ill-feeling for Goodwin. Although he said nothing about his purpose in going to Goodwin's car, everyone about the boarding house seemed to know there was going to be a fight.  The evidence is not clear as to what specific thing caused them to anticipate trouble, but the suggestion was made that there was going to be a fight and everybody was looking.  When Baskin entered Goodwin's car he passed out of sight of three or four women watching from the boarding house, who were the only witnesses at that time to what occurred. They immediately heard sounds indicating a fight was in progress in Goodwin's office.  Goodwin testified that Baskin walked into his office and without warning of any kind struck him while at his desk and before he noticed who was present, and continued to strike him several times until he struggled to his feet to defend himself; he then conducted his side of the fight as best he could until they got out on the porch in view of the witnesses at the boarding house.  There the combat continued for a considerable time, and finally Goodwin was knocked off or fell off the porch with Baskin after him.  Then the men were seen to be struggling in a ditch extending along the spur track within a few feet of the car.  Afterwards they were on the porch again, and again were off.  From some of the witnesses it appears that Baskin knocked Goodwin off the porch three times, or they fell off three times in the struggle, and at least twice Baskin had Goodwin down in the ditch.

It might be said that most of these three or four women failed to see the fight entirely through from beginning to end.  One of them fainted; another was afraid there was going to be trouble and rushed, or was pushed, into her room; another went for her husband, and there appears to have been intervals when none of them were looking.  After a time both men again appeared on the porch and Baskin had a pump handle in his hand.  The

evidence is conflicting as to just where he stood with this pump handle. He was either on the ground or standing on the steps of the porch or on the porch. A little before this one of the women, a Mrs. Miller, went some distance to wake up her husband, who worked on the night shift, to have him come down there and separate the men. He appeared about the time the pump handle was brought into requisition, and attempted to separate them, but was unable to keep them apart. Out of an earnest and mutual desire for each other's hurt they rushed together again in spite of his efforts. According to Miller's testimony, Baskin struck over him *at* Goodwin with a pump handle and then struck Goodwin with it. About that time Goodwin went into the car and reappeared with a revolver in his left hand. For a few seconds everyone's recollection becomes blurred. Miller beat a hasty retreat at sight of the pistol. The women in the boarding house became confused in one way or another. The next definite act testified to was that Goodwin with the revolver in his hand, but not pointed at Baskin, made Baskin give up the pump handle. Baskin handed it to him, and at the same time Goodwin said, "You dirty rascal, if you don't get away from here I'll shoot you." It appears Goodwin then took his revolver back in the car and laid it down. Then he was seen a short time afterwards to strike Baskin with a pump handle. One or two witnesses say that he struck him on the head, but many of them say he struck him on the side. At that time they were down on some planks that ran across the ditch from the side of the car to the railroad track. Goodwin himself testified that after he took one pump handle from Baskin, Baskin got hold of another. It seems these pump handles were "sticking up" somewhere about the porch where they could easily be reached. He said he struck Baskin on the head while they were still struggling on the porch, that Baskin pulled him off and while they were struggling on the planks across the ditch he struck him on the side. Most of the witnesses saw the blow on the side, which did not appear to hurt Baskin. Immediately after that, however, Goodwin returned to his car, and Baskin sat down, or leaned

over, for a `moment and then went to his car. Shortly
afterward Baskin returned to the boarding house and
then went to his car again. A second time he returned
to the boarding house and was unable to talk. He at-
tempted to write, but could not write in an intelligible
manner. This was explained afterwards by a physician
as due to a blood clot forming on that part of the brain
which affects the organs of speech. At any rate, a doctor
was summoned, Baskin was taken to Memphis, was oper-
ated on and died in a day or two from a blow on the head
which fractured the skull and caused a blood clot to form.

I.   Two instructions given on the court's own motion,
submitting a theory of self-defense, were objected to.
One of them, number 9, contains this language:

"If at the time defendant, A. W. Goodwin, struck
and killed Robert M. Baskin, . . . he
Instructions on Self-Defense. had reasonable cause to believe and did be-
lieve that it was *necessary for him to strike
and kill,* to protect himself from such apprehended danger,
you will acquit the, defendant on the ground of self-de-
fense.

The other instruction, number 10, emphasizes the
theory of the trial court in this way:

"On the question of self-defense the court instructs
the jury that self-defense is· a defense of necessity and
before it can avail the defendant, you must find and be-
lieve from the testimony that the defendant not only
*thought he was in danger of being killed* but that he had
reasons to believe that he was in danger of being killed or
receiving great bodily harm and that such danger existed
at the moment that he struck the fatal blow," etc.

Both instructions provide that self-defense could not
avail defendant unless such facts were found.   These
two instructions taken together made it necessary for the
jury to find, before they could acquit the defendant:
*First,* that he believed himself in danger of being *killed,*
and struck Baskin in order to save his own life; and,
*second,* that he had cause to believe and did believe it
necessary to *kill* Baskin in order to protect himself.   If

he merely believed himself in danger of receiving great bodily harm, or if he only thought it necessary to disable or beat off his antagonist, he could not be acquitted on the ground of self-defense. It is easy to see how a skillful prosecutor could drive home the exact significance of that language with great force and effect. The rule is that he had a right to defend himself and use such force as was necessary for the purpose, not only if he believed he was about to be killed, but if he believed he was in danger of receiving great personal injury; provided, he had reasonable cause to believe it. The very phrasing of Section 4451, where justifiable homicide is defined, makes it as available a condition for self-defense if the person assualted believes he is in danger of receiving a serious injury as if he believes he is in danger of being murdered and commits homicide to prevent such result. All rules formulating this defense include that feature—apprehension of bodily harm—as well as an apprehension of death. [State v. Matthews, 148 Mo. l. c. 194; State v. Stockton, 61 Mo. l. c. 384; State v. Brooks, 99 Mo. 137, l. c. 144.] Instruction number 10 was therefore error.

The State cites as a justification for instruction number 9 the case of State v. Gee, 85 Mo. l. c. 650, where an instruction in the same language was approved. But in that case the defendant used a revolver and shot to kill the decedent, with whose murder he was charged. The instruction provided that before he could avail himself of self-defense he must have had cause to believe and must have believed that it was necessary *to shoot and kill* his assailant in order to protect himself from danger. It has been approved in later cases, but always where a deadly weapon was used. However, in still later cases, that form has been criticized by this court under circumstances similar to those in the Gee case. [State v. Lewis, 248 Mo. l. c. 508; State v. Swearengin, 269 Mo. 177.] In each of these cases this court criticized this instruction, even when the defendant used a revolver and shot to kill, as failing to give him the benefit of some purpose he might have entertained of disabling his antagonist without killing him.

In this case the evidence strongly tends to show that the defendant didn't intend to kill Baskin and that he did not believe it was necessary to kill him. The pump handle was not a weapon which was necessarily deadly or likely to cause death. At one time during the combat defendant had his revolver in his hand and did not use it, but laid it down and continued to fight without it. It is equally apparent from the evidence that he did not believe himself in danger of being killed. While the assault upon him was wholly unprovoked, inexcusable and his office invaded for the purpose, he probably believed himself in danger only of being "beat up," an end which was in speedy process of accomplishment. Entertaining that belief, and having reason to entertain it, he was justified in using a pump handle or any other weapon to which he could lay his hand, and which would give him an advantage without killing his antagonist. Of course if he struck with greater force than seemed necessary, or struck after he had the advantage or had disarmed Baskin, he could not be acquitted. All this was for the jury, but under the evidence the jury might easily find that he neither was afraid of being killed nor believed it necessary to kill, and in that case those instructions took away his right of self-defense.

II.    Error is assigned to the failure of the trial court
Defendant    to properly rebuke the attorney employed to
as Witness.    assist in the prosecution for his persistence in
cross-examining the defendant in regard to matters not testified to in his examination in chief.

The attorney for the State had brought out, on cross-examination of defendant, that Mr. Pingle, the superintendent, had spoken of discharging Baskin because his work was not satisfactory. The attorney then, in order to impugn the good faith of the defendant, asked him if it was not a fact that he did not have a word to say about the work of Baskin when he was alive, but selected the time when he was dead and could not answer his charges. This question was entirely outside the scope of the direct examination. The objection to it was sustained, but the

prosecuting attorney then proceeded with his cross-examination. He called attention to one statement made by the defendant in explaining why he had instructed Mrs. Kennedy to call Vena Biggs away from Baskin's car. Defendant stated in answer to a question by his counsel, that it was "to protect the respectability of the camp." He had previously testified that he had full charge of the camp and had been instructed to keep the camp "clean." The prosecutor asked the defendant if *his* morals would not permit the girl to stay there. This was objected to and the objection overruled; exception noted. The question was entirely improper. The attorney for the State continued by asking a question which affected the defendant's conduct as to morality at some previous time and place. Objection to this was sustained, but the attorney persisted in asking if he had not been guilty of immoral conduct at the camp at some previous time, and asked if he had not caused the discharge of the keeper of the boarding house because of her objection to his immoral conduct, pursuing this inquiry with a number of questions before the court sustained objections to them. The trial judge sustained these objections, but allowed the attorney for the State to proceed without rebuke, and he persisted in it to a great length. He asked the defendant if Mrs. Kennedy and the other ladies knew Vena Biggs was in Baskin's care and whether their morals were being assaulted. Before the question was answered he repeated it in another form, and asked if Mrs. Kennedy and the others knew the girl was in the car and whether any complaint had been made about it by them. The court overruled the objection to it.

The only pertinency of the evidence relating to the calling of Vena Biggs from Baskin's car was to explain why Baskin went to Goodwin's car. The State saw fit to bring it out. The only relevant purpose it could serve would be to show Goodwin invited or expected trouble, but nothing of that kind was suggested. Defendant's testimony in chief referred only to the duty assigned him by his superior, which he was attempting to discharge when he caused the girl to be called away. His own moral de-

State v. Goodwin.

linquencies at another place or at a previous time, and any conduct of his and any trouble of his with the previous boarding-house keeper on account of his conduct, were entirely outside the scope of the chief examination, as was the feeling entertained by the other women toward Vena Biggs. The persistence and violence of the cross-examination by the attorney for the State, although objections to most of his questions were sustained, were particularly harmful and under the circumstances calculated to arouse a prejudice in the minds of the jury and make them think Goodwin was trying to hush up facts about his own character which might affect his guilt. The failure of the trial court to put an end to it by a severe rebuke, which would have reminded the attorney for the State that he was allowing his zeal to run away with his sense of fair play, left the bad impression to remain with the jury. This sort of examination had been condemned as reversible error by this court in several cases. [State v. Sharp, 233 Mo. 1. c. 286; State v. Webb, 254 Mo. 1. c. 434-5; State v. Pfeifer, 267 Mo. 1. c. 31-2.]

Errors are complained of in giving instructions on the court's own motion on murder in the second degree, but inasmuch as the defendant was convicted of a lower offense, manslaughter, the alleged error was not harmful and will not be reviewed. [State v. Wilson, 250 Mo. 1. c. 329.]

Since a new trial will be ordered, it is unnecessary to review the assignment of error in refusing the defendant's application for a continuance.

The judgment is reversed and the cause remanded.

*Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WHITE, C., is adopted as the opinion of the court. All of the judges concur.