THE STATE v. GEORGE W. FARRELL, Appellant.—6 S. W. (2d) 857.

Division Two, May 25, 1928.

*Roy B. Meriwether* and *James P. Boyd* for appellant.

*North T. Gentry,* Attorney-General, and *J. D. Purteet,* Special Assistant Attorney-General, for respondent.

WHITE, J.—In December, 1926, in the Circuit Court of Monroe County, the defendant was tried on a charge of murder in the second degree. The jury found him guilty of manslaughter and assessed his punishment at five years in the penitentiary. Judgment was pronounced accordingly and the defendant appealed.

The defendant was charged with killing his nephew, Leslie Farrell, thirty-nine years of age, of medium height and weight and good health. The defendant was sixty-eight or sixty-nine years of age and in feeble health.

Defendant's brother, Tom Ed Farrell, seventy years of age, had two sons, Leslie, the deceased, and Gene. The defendant brought a partition suit against Tom Ed Farrell, and bad feeling ensued between the defendant and his brother's family on account of it. On October 23, 1926, Tom Ed Farrell and his two sons met the defendant in Paris and had a conversation in which ill feeling was expressed. Leslie Farrell at that time asked the defendant why he was always nosing into everything; that he had done everything he could to turn the heirs against his father; always trying to make trouble. Among other things defendant said: "I aint able to fight none of you, nor your dad aint able to fight."

And then Tom Ed said: "If you want to fight I will fight you anywhere."

That was all that occurred that day.

On November 13, 1926, following, the defendant met Leslie Farrell in the town of Madison, where Leslie was delivering milk. He had a half-gallon bucket on his arm. Defendant shot him down in the street. Leslie died almost immediately.

I. The appellant claims that the evidence is insufficient to support a verdict of manslaughter; that the only evidence in the case shows that the defendant shot purely in self-defense.

Several witnesses saw the parties after the difficulty began. No one heard anything said between defendant and Leslie. A girl named Mae Meals was standing in a grocery store and saw Leslie Farrell first. "He backed into my view coming from the east going backwards, and George Farrell was coming towards him with a gun; George Farrell had a gun when I saw him." She further said that Leslie Farrell was going back west "with his hands up like this" (indicating).

She didn't want to see the trouble and turned her head, and heard three shots; two quite close together, and then a pause and a third one. She next saw Leslie Farrell lying on the walk, trying to raise his arm. She was asked how soon after she saw Leslie Farrell going back and George Farrell coming towards him with a gun did she hear the gun? She answered: "It seemed to me almost immediately."

On cross-examination she was asked if at the preliminary examination, she didn't make this answer to a question:

"Well, it just seemed to me I had not more than turned my head until I heard the gun." She answered that that was right; a lengthy cross-examination did not cause her to vary from those statements.

One Clara Bunnell was standing close to the Meals girl at the time. She saw Leslie Farrell "when he ran back in front of Baker's store with his hands up." She didn't see George Farrell, but she heard the shots. And she didn't see Leslie Farrell after she heard the shots. From her testimony the inference is reasonable that Leslie Farrell again passed out of her sight advancing upon the defendant. Miss Meals said to her, "There is a gun," and witness thought there was going to be a fight and she didn't want to see it.

A boy named James Robinson, ten years of age, was sworn. He was questioned closely about his ability to understand the nature of an oath. He said he did not, but he knew if he didn't tell the truth he would go to jail. He saw Leslie going up the street when George stopped him and they talked a little while. Witness didn't know what they said. He continued: "George, he drew out his pistol— and when he ran in to his coat and got the pistol, I don't know where it was at, ran in to his coat and got it, and then he shot him two first times, and then got his hand and kind of pushed on his other hand and then shot him a third time. I never seen any more of him."

Witness was then asked what Leslie Farrell was doing while George was shooting. He answered:

"When he saw that gun, when he pulled out that gun he threw up his hands like that (indicating), and backed off from him."

"Q. Did you see him do anything while he was shooting?" (Apparently "him" means Leslie, and "he" means George). A. When he shot the second time he fell to his knees."

One J. M. Forrest testified that he was in the drug business and standing in the entrance to his drug store when defendant came to him and asked him to call the sheriff, that he had shot a man that struck him. Witness said there was a red spot on defendant's cheek, not bleeding. He didn't notice any other marks or scratches.

Delbert Pierce testified that he saw George W. Farrell going east and Leslie Farrell going west, and they met, and in a few seconds the two were scuffling, pushing and shoving, and then pretty soon he saw they were beginning to separate and he heard a shot fired. He said: "Though at first I seen George Farrell separate out as Leslie held up his hand like that, and he kind of made a step towards George Farrell and George Farrell shot either two or three times."

Charles Griffin was in Madison on that day and he heard the first shot fired and saw George Farrell and Leslie Farrell. "I just stepped out the door and stepped two steps west and just as I threw up my head the first shot fired and they were right close together, had hold of one another, Les with his right hand and George with left hand against him. One shot with a little pause and shot two more and reeled around and George went over with him to the walk. That is all there was to it."

Wesley Elsberry testified that he was going down the street and his attention was directed by the rattling of a tin bucket back on the sidewalk. This was Leslie's milk bucket. He looked up and saw a man kind of humped over. About that time he saw Leslie Farrell straighten up, hat off, kind of turned and come back, and at that time there was a shot.

Gale Holohan testified that the first thing he saw "was Les Farrell hit at George Farrell and George pulled out a gun and shot Les." Witness could not say that Les made any further effort to strike George. On cross-examination witness testified that after the first two shots Les kept on coming and when Les struck at George, George threw up his hand to ward off the lick.

Joe Baker, deputy constable, testified that he took defendant's gun from him; that defendant had a swelled knot right above the cheek bone and a skinned place on his throat; the button of his shirt collar had been pulled off; it looked fresh at the time.

The defendant introduced evidence to show that Leslie Farrell was trying to get hold of George Farrell's throat when George took a step backward and shot; that the defendant was an old man and in weakened condition from ill health, and the deceased was a young man in robust health; that the deceased violently attacked the defendant in the street and he shot in self-defense.

The evidence illustrates the conflicting viewpoints with which different witnesses see the same incident. According to the testimony introduced by the State it was difficult to tell who was the aggressor. The defendant was armed, evidently expecting trouble. The deceased had no weapon of any kind. It was the duty of the jury to take into consideration all of the evidence. Where the evidence of the State conflicted on minor points they could select from that conflict such parts as seemed to them most reasonable. According to the evidence of the first three witnesses introduced by the State, they could reasonably infer that no act of aggression threatened great bodily harm to the defendant before he began to fire. That evidence was sufficient to warrant an information charging murder in the second degree. The general rule is that murder in the second degree arises from intentional killing with a deadly weapon in the absence of proof tending to show murder in the first degree, or to show facts which would reduce the killing to manslaughter or excusable or justifiable homicide. [State v. Snow, 293 Mo. 1. c. 149; State v. Minor, 193 Mo. 597; State v. Yates, 301 Mo. 1. c. 371.]

According to the evidence of other witnesses, there was a scuffle between the two. Leslie Farrell struck at George Farrell. The witness did not say that the blow landed. Other witnesses stated that the defendant had a bruise on his cheek; his shirt collar button was off and there were scratches on his throat, according to some of the evidence. Les advanced upon George after the first shot was fired. The jury might reasonably infer from all these circumstances that Leslie seized George by the collar and perhaps struck him after he was fatally shot.

A defendant may be convicted of manslaughter where he is charged with murder, if the facts warrant it. [State v. Ludwig, 70 Mo. 412.] The defendant had a right of self-defense, but he had no right to use any more force to protect himself than was necessary. A blow of the fist or a common assault will not ordinarily justify a killing in self-defense. There must be well-founded apprehension of great bodily harm. [State v. Caldwell, 231 S. W. 613; 30 C. J. 73-74.] The use of a deadly weapon is justified only where it is necessary in defense of one's life to prevent great bodily harm. It was a question for the jury to say whether under the circumstances the defendant was justified in believing he would suffer great bodily harm at the hands of his nephew so as to justify him in shooting. The defendant

must have known that the deceased was not armed, and that the assault of the deceased, if he made one, was not of a character to threaten the defendant's life or inflict great harm upon him, but sufficient to arouse a sudden heat of passion which caused defendant to kill in a manner which may be defined as manslaughter.

II. The appellant objects to Instruction No. 3 on manslaughter, because it authorized a verdict of guilty if the defendant "intentionally shot and killed the said Leslie Farrell without malice aforethought as these terms are hereinbefore explained, and under such circumstances that it is not justifiable or excusable homicide, and not in the lawful defense of his person as defined in other instructions."

The objection is that justifiable homicide is, in lawful defense of the defendant's person, and therefore it was confusing to the jury and placed an unnecessary burden upon the defendant. But the same instruction ends with this definition:

"Justifiable homicide as used in the instructions means the killing of another in lawful defense of one's person as more fully explained in other instructions given."

Thus, while justifiable homicide and the lawful defense of his person are connected by the conjunction "and" in the main part of the instruction as if they were two separate conditions, the concluding definition makes them one and the same thing, and a jury could not misunderstand it.

It was further objected that the same instruction also includes the definition of excusable homicide: "Excusable homicide, as used in these instructions, means accidental killing of another."

Section 3234, Revised Statutes 1919, defines excusable homicide as one committed by accident or misfortune in either of the following cases: "First. In lawfully correcting a child, or apprentice, or servant, or in doing any other lawful act by lawful means, and with usual and ordinary caution, and without unlawful intent; or, second, in heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, or without any dangerous weapon being used, and not done in a cruel or unusual manner."

The definition in the instruction must be considered with reference to the facts of the case. The facts exclude any sudden combat without a dangerous weapon, and exclude the correction of a child, servant or apprentice, and the only part of the statute which could apply would be the "accident or misfortune . . . in heat of passion upon a sudden or sufficient provocation." The definition would have been more accurate if it had limited the homicide in that way, but instead of that it allows the jury to take into consideration *any* accidental killing. "Accident" and "misfortune" evidently

mean one and the same thing; that is, a killing without intention to kill. And the definition of excusable homicide in the instruction, instead of narrowing the field for the jury's consideration, broadens it, and the error, if any, was against the State, of which the defendant cannot complain.

It is further contended that Instruction 4 did not fully state the law of self-defense, under Section 3233, Revised Statutes 1919, and that it is in conflict with Instruction D-1 given for defendants. Each of these instructions is of considerable length, and it is unnecessary to set them out. Instruction 4 quite fully states the law of self-defense, and Instruction D-1, given for the defendant, does not conflict with it, but goes rather more particularly into some details of the principle. The jury were properly and fully instructed on the law of self-defense.

Objection was made to Instruction 7, which is as follows:

"7. The argument of counsel is for the purpose of aiding you to reach a proper verdict in the cause by refreshing in your mind the evidence which has been given to you in this cause, and by showing the application of the law thereto; but whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be, and by the law as given by the court in these instructions, and render such verdict as in your conscience and reason and candid judgment seems to be just and proper."

The objection of appellant to it is that it would cause the jury to disregard the arguments of counsel and that it is a comment upon the evidence. It is not a comment upon the evidence at all. Instead of directing the jury to disregard the argument of counsel, it directs them to pay attention to that argument; tells them that the purpose of the argument is to aid them in reaching a verdict. The instruction was entirely proper.

The case was well tried, and we are unable to find any reversible error in the record.

The judgment accordingly is affirmed. All concur.