STATE of Missouri, Respondent,

v.

W. A. BROOKSHIRE, Appellant.

No. 48488.

Supreme Court of Missouri,

Division No. 2.

Jan. 8, 1962.

Motion for Rehearing or for Transfer to
Court en Banc Denied Feb. 12, 1962.

W. A. Brookshire, Columbia, Richard K. Phelps, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Robert E. Hogan, Sp. Asst. Atty. Gen., for respondent.

PER CURIAM.

W. A. Brookshire, charged with the offense of murder in the first degree, was convicted of manslaughter and sentenced to three years' imprisonment for the killing of Ralph Collings, one of his farm hands, at defendant's farm home about ten miles south of Columbia, Boone County, Missouri. He has appealed. The main contentions in his brief question the jurisdiction of the trial court, the overruling of certain motions on behalf of defendant, the admissibility of certain evidence, the submissibility of the State's case, and the court's action with respect to instructions, given and refused.

I. Defendant contends the order granting a change of venue from Boone to Cole County conferred no jurisdiction on the Circuit Court of Cole County because under his application for a change of venue the judge of the Boone County Circuit Court was disqualified to make any order except an order disqualifying himself. Boone and Callaway Counties comprise the Thirteenth Judicial Circuit. Section 478.107.[1] Defendant, who had been a Superintendent of Schools, a State Senator, a practicing lawyer, now retired, and a farmer, in an "Application for Change of Venue," filed November 29, 1959, alleged, among other things, that: "The opposite party has an undue influence over the mind of the Hon. W. M. Dinwiddie, Judge of this court"; that, in effect, the defendant and the prosecuting attorney had orally agreed the defendant could not have a fair and impartial trial in Boone or Callaway County, and prayed for "a change of venue to some county and some court where this prejudice does not exist." The Court, on said day in the presence of defendant and the prosecuting attorney, entered an order transferring the cause to the Circuit Court of Cole County. Defendant interposed no objection to this order, and so far as disclosed of record, was satisfied with the result obtained.

The granting of a change of venue of the place of trial is a statutory privilege which may be waived. Error on such an application is a matter for preservation in the court granting the change. The point when first made on appeal is too late to avail. State v. Gamble, 119 Mo. 427, 24 S.W. 1030, 1031(1); State v. Ottinger, Mo., 36 S.W.2d 942 [1]. See State v. Bailey, 344 Mo. 322, 126 S.W.2d 224, 228 [6–10], cited by defendant. In State v. Perkins, 339 Mo. 27, 95 S.W.2d 75, 76 [1–4], Court en Banc held the right to disqualify a judge, like an application for a change of

I. Statutory references are to RSMo 1959 and V.A.M.S.

the venue of the place of trial, is a privilege which may be waived either before or after the order has been entered. State v. Hampton, Mo., 172 S.W.2d 1, 2 [1, 3], states: "Appellant, by filing a motion for continuance in the court to which the cause was transferred, waived any irregularities in the transfer." State v. Nave, 185 Mo. 125, 84 S.W. 1, 3, 4. This defendant invoked the jurisdiction of the Circuit Court of Cole County by filing seven motions for affirmative relief, including the granting of a continuance of the trial of the case. Defendant's contention is overruled.

■ II. In connection with the foregoing defendant also asserts the Circuit Court of Cole County erred "in refusing the Defendant the right to file an application for a change of venue." Defendant's brief states: "this part of the proceeding is not in the transcript." This transcript is approved by, among others, defendant and his attorney. We are bound by the transcript of the record certified here and matters not shown therein cannot be considered or determined. State v. Whitaker, Mo., 312 S.W.2d 34, 37 [2].

III. Defendant alleges in his motion for new trial: "The court committed error in denying defendant's motion to suppress evidence for the reason that the record shows that the defendant was taken into custody without a warrant and without any reason, and in face of the fact that all the evidence pointed to justifiable homicide and should have been exonerated at the preliminary examination." Defendant's motion sought to suppress evidence relating to the cartridge cases, bullets and pistol found in and taken from his home. He cites "U. S. Constitution, Arts. IV and V of Amendments; Constitution of Mo., Art. I, Secs. 15 and 19; Mapp v. Ohio," 367 U.S. 643, 81 S.Ct. 1684 [3–5], 6 L.Ed.2d 1081.

■■ The record before us preserves no evidence or proof offered in support of said motion and there is nothing upon which to predicate prejudicial error as the allegations in said motion do not prove

themselves. State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878, 887 [16, 17], rules this issue against defendant.

■ Furthermore, defendant voluntarily testified at the trial that he got "this gun" and shot Collings. The difference between his and the State's position is that he contends the homicide was justifiable and the State contends it was manslaughter. In view of defendant's admissions he may not now successfully urge prejudicial error. State v. Smith, 357 Mo. 467, 209 S.W.2d 138, 140 [2, 3], and authorities cited; State v. Bray, Mo.App., 278 S.W.2d 49, 52 [3]; Annotation, 50 A.L.R.2d 570, § 8, b.

■ The State answers this contention on defendant's presentation. In Mapp, supra, seven or more officers forcibly broke into and searched defendant's home under asserted authority of a warrant to search for lascivious books, pictures and photographs, but no search warrant was produced or accounted for at the trial. The Mapp case involved constitutional provisions against unreasonable searches and seizures without a valid search warrant. See Mo.Const. Art. I, § 15, V.A.M.S. The record before us involves a search incidental to a lawful arrest. This has been recognized as proper by federal courts. Harris v. United States, 331 U.S. 145, 150–153, 67 S.Ct. 1098, 91 L.Ed. 1399 [6–10]; Annotation, 4 L.Ed.2d 1983, §§ 2, 5, 7. The evidence at the trial, upon which the State relies, justified the action of the officers. When they arrived, defendant invited them in, led them to the kitchen and showed them the dead body, stating the man had been shot. However, when asked who shot him; who the man was; and where the gun was, defendant refused to answer but demanded that a jury be brought out and they would have a hearing. Defendant did not accuse anyone else of the shooting and was placed under arrest within ten minutes after the officers arrived. The officers had probable cause to believe that defendant had committed a felony. State v. Edwards, Mo., 317 S.W.2d 441, 445 [2, 3].

Deputy Sheriff Lukehart took defendant to jail in Columbia, secured a coroner's jury and returned with the jury to defendant's farm in about an hour. Deputy Sheriff Duncan and Coroner Perna remained at the farm and assumed control of the premises. Nothing had been disturbed and the members of the jury were cautioned to avoid disturbing anything. After the jury viewed the scene, the officers searched the house, which was in defendant's possession at the time of his arrest, picking up the cartridge shells (seen on the dining room floor upon their arrival), three bullets in the kitchen, and defendant's automatic pistol in an upstairs bedroom in the course of their investigation. This search for things connected with the crime for which defendant was arrested was incidental to his arrest. State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743, 745 [2, 3], citing cases, and authorities supra. Clearly, defendant's presentation does not establish the asserted error.

■ IV. Defendant in his brief alleges the court erred in overruling his motion to produce a signed written statement made on May 25, 1959, by witness Harvey Beavers. We fail to find this point presented to the trial court in defendant's motion for new trial (Sup.Ct.R. 27.20, V.A.M.R.; Section 547.030), and, first presented in defendant's brief, it is not preserved for review. State v. Wilson, 361 Mo. 78, 233 S.W.2d 686 [12]; State v. McCarthy, Mo., 336 S.W.2d 411, 416 [4, 8]. In addition, defendant states in his brief that the statement "evidently was favorable to the defendant"; but there is no evidence or proof offered in connection with said motion in this record and, hence, nothing upon which to predicate prejudicial error. Consult State ex rel. Phelps v. McQueen, Mo., 296 S.W.2d 85 [1, 7]; State v. Kelton, Mo., 299 S.W.2d 493, 497 [8, 9].

■ V. On the morning of April 27, 1960, following a motion to quash the jury panel filed April 26, 1960, and, we understand, the making of the peremptory challenges, defendant filed a motion to quash the twelve-member jury, alleging it was selected from a panel not properly impanelled according to law; selected after improper statements and questions by the State on the voir dire examination; and selected after prejudicial statements concerning defendant by veniremen on voir dire examination. The court overruled. Defendant claims error. The State does not question this procedure (see State v. Logan, 344 Mo. 351, 126 S.W.2d 256 [1–3], 122 A.L.R. 417), but answers defendant's complaint. During the course of the voir dire examination defendant had ample opportunity to protect his rights if the court abused its discretion in any respect. There was no showing of any improper action excluding Negroes from the panel (Logan, supra), if defendant, of the white race, may raise that issue. Defendant in his brief states that pages 26 to 120 of the transcript disclose that "in many instances extreme prejudice was shown against the Defendant." Neither this court nor the trial court is required to read the record and speculate what particular instance (or why it constituted prejudicial error) defendant had in mind as falling within a stated conclusion in a motion for new trial or in a brief. Sup.Ct.R. 27.20 and 83.05(a) (3); § 547.-030; State v. Gregory, 344 Mo. 525, 127 S.W.2d 408[2]. We have studied the voir dire examination and find the court was quick to excuse veniremen concerning whom there was any question and to admonish the panel on proper occasions. We find no error. State v. Weidlich, Mo., 269 S.W.2d 69, 71 [5]; State v. Taylor, Mo., 324 S.W.2d 643, 648 [9–11], 76 A.L.R.2d 671.

VI. Defendant contends his motion for a judgment of acquittal should have been sustained. The jury could find the following facts from the probative evidence considered in the light most favorable to the State (State v. Smart, Mo., 328 S.W.2d 569, 573 [1]; State v. Hill, Mo., 328 S.W.2d 656, 659 [1]):

Defendant's house faces west. The entrance on the north to the dining room is used. A kitchen is south of the dining

room. The back porch is south of the kitchen. An open tool cabinet, with a short handle blacksmith sledge hammer, weighing three to five pounds, on top of it was on the back porch. Defendant kept a .32 caliber automatic pistol in a vanity table in an upstairs bedroom. He had no telephone.

The homicide occurred between 8:30 and 9:00 a. m. Monday, May 25, 1959. Harvey Beavers and defendant were the only witnesses testifying to facts occurring on the 25th leading up to the homicide.

Beavers came to work for defendant Friday, May 22. On the way to the farm from St. Louis, where Beavers was hired, defendant told him Collings was "so weak he can't harness the horse." Beavers and Harold Hayman, who died prior to the trial, occupied two rooms with a door onto the back porch and Collings moved to quarters in defendant's part of the house. Collings was described as 5 feet 4 inches tall, weighing about 135 pounds, a pretty spry old man, smaller than defendant.

Saturday, May 23, after arguing, defendant and Collings went to St. Louis, returning about midnight. Both stated that defendant tried to buy Collings a bus ticket but Collings wouldn't get out of the automobile. Collings said he couldn't work for nothing and defendant would not pay him. Collings worked on Sunday, telling Beavers he would work a few days more and was going to the law if he was not paid.

On May 25, Collings brought two suitcases to Beavers' room and was ready to go soon after breakfast. Defendant came to the door and said: "I have told you to get out of my house." Collings answered: "I will, when you pay me." Defendant said: "I don't owe you a damn penny." Defendant, soon thereafter, called Beavers and Hayman to the kitchen and had them sign a statement that he had told Collings to get out of his house. Collings, upon their return, told them: "You fellows better get out of there. There is going to be trouble." About fifteen minutes later defendant, in a pleasant manner, asked Collings to show Hayman and Beavers how to feed the cattle. Collings said, on the way to the barn: "You reckon that son-of-a-bitch will put something in my suitcase and accuse me of stealing it?" Witness answered: "No." Collings complied with defendant's request, returned to the house, and entered the back porch. Beavers, then working about thirty feet away, next saw Collings come off the back porch and walk pretty fast around to the north side of the house, looking upstairs to the windows, and saying something. Collings turned back and said: "If I don't get my money, there is going to be one dead son-of-a-bitch" and went in through the screen door on the back porch. After a minute or two Beavers heard a racket, like things being turned over, and then shots, one right after another, after which everything was quiet.

After ten minutes or more, defendant called Beavers to the house. Defendant had the kitchen door open and, when Beavers and Hayman entered, said: "There he is." Broken glass from the back door was on the kitchen floor but Beavers had heard no sound of glass breaking. Defendant, showing Beavers his wrist, said Collings hit him with the hammer. Beavers saw nothing wrong, only a red spot that looked like a mosquito bite, no skin was broken. Beavers suggested defendant call the law and returned to work. Ten or fifteen minutes later defendant asked Beavers to go to town with him and Beavers, Hayman and defendant went to Columbia. Defendant got his mail at the post office. He started back, stopped at a public telephone booth and informed the Sheriff's office that there was "a dead man in my house." Beavers and Hayman went to their room. After a few minutes, they went into the dining room. Defendant removed his shirt and had them look where he said Collings had struck him with the hammer on the back of his right shoulder. Beavers could see nothing wrong with defendant's shoulder. Collings' suitcases were near the dining room front door, and defendant, being

asked, answered: "I brought them in here." Dr. R. J. Miller examined defendant, who complained of pain in the right shoulder and left wrist, on May 26. He found no evidence of any injury or bruise on defendant's shoulder, but defendant had superficial scratches of a circular nature on the back of his left wrist. Deputy Sheriff Lukehart testified he put handcuffs on defendant when he took him to Columbia, and when he removed them there was a red mark on the back of defendant's left wrist.

The first time Beavers entered the kitchen Collings' hat was about twelve inches from his head but it was on his head the second time Beavers was in the kitchen.

Defendant testified Collings had the hammer in his hand while in the yard. Beavers testified Collings did not have the hammer, didn't have anything, in his hand while outside the house.

Deputy Sheriffs Theron Duncan and Pearlie Lukehart and Dr. Vincent Perna, Coroner, arrived at defendant's home about 10:35. Defendant admitted them to the house, where they saw the dead body. Defendant told them the man had been shot, but when they asked him who shot the man, who the dead man was, and where the gun was, defendant would not tell them but would say for them to get a jury out here and we will have a hearing. Collings' body was face down, with his arms underneath, his feet near the dining room door and his head, with his hat on, toward the south, near the kitchen table. The sledge hammer was on the floor twelve to fourteen inches from Collings' head and a newspaper covered the first three or four inches of the handle. Deputy Lukehart, on cross-examination, stated it would be unusual for the handle to fall, when dropped, underneath a newspaper.

Five spent cartridge cases were on the dining room floor. Two bullets recovered from Collings' body and three found in the kitchen had been fired from defendant's gun. Powder burns indicated that two, perhaps more, shots were fired with the gun in contact, or practically so, with Collings'

coat. The testimony established that two fatal bullets, each of which severed or lacerated the aorta, entered Collings' body. The immediate cause of death was massive hemorrhage. Either of the fatal wounds would have caused instant unconsciousness, causing Collings to fall, and death within minutes. Four, perhaps five, bullets struck Collings.

Defendant, his only witness, testified to the effect that he shot in self-defense; that Collings, threatening to kill him and although told to stop, smashed the kitchen door with the hammer and came into the kitchen; that he got his pistol from the dining room table; that Collings was striking at him with the hammer and struck a glancing blow on his left wrist; that he fired; that Collings kept swinging and struck him on the right shoulder; that he fired shots in succession; that Collings stopped, took two steps, and fell in the kitchen, the hammer falling ahead of Collings.

Seven witnesses testified in rebuttal that defendant's reputation for truth and veracity in the community in which he lived was bad. There was no contradictory testimony.

■■■ Defendant's guilt or innocence of the offense of manslaughter (State v. Taylor, Mo., 309 S.W.2d 621, 624 [5–10]) was for the jury. He intentionally shot Collings. The jury was not bound by but could accept or reject any part of defendant's testimony, the same as the testimony of any other witness. State v. Hill, Mo., 328 S.W.2d 656, 659 [2, 3], and cases cited; State v. Bartlett, 359 Mo. 881, 224 S.W. 2d 100, 102 [1–3]; State v. Littlejohn, 356 Mo. 1052, 204 S.W.2d 750, 752 [1, 2], and cases cited. Defendant's motion for judgment of acquittal at the close of all the evidence was correctly overruled. Any error in overruling defendant's motion for acquittal at the close of the State's case was waived by defendant offering evidence thereafter. State v. McMillian, Mo., 338 S.W.2d 838, 842 [1].

VII. Defendant's contention that Coroner Dr. Vincent Perna was not qualified to give an opinion as to the effect of the fatal bullets upon Collings' body and as to how long Collings lived after being shot on the grounds there was no attempt to qualify the witness and the further reason that his testimony was prejudicial and was not based upon any scientific or actual facts is without merit. No authority is cited. Defendant's assertions that no attempt was made to qualify Dr. Perna are refuted by the record. The witness performed an autopsy and his testimony was based on facts ascertained by him. State v. McLaughlin, 149 Mo. 19, 50 S.W. 315, 318(1). See 32 C.J.S. Evidence § 480.

VIII. Defendant states: "The Court committed reversible error in permitting prosecuting attorney to cross-examine the Defendant on matters not relevant to his testimony given directly, and which testimony and cross-examination was argumentative in that it required the Defendant to directly dispute the testimony of the State's witnesses and to permit Prosecuting Attorney to argue with and badger the Defendant." Defendant cites only State v. Mann, 83 Mo. 589. The contention is not well taken for several reasons. The cited case does not disclose prejudicial error on the issue presented. Defendant's motion for new trial does not specify what testimony, or what specific arguing with or badgering of defendant is involved, and does not comply with the requirement that motions for new trial "must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor." Sup.Ct.R. 27.20; Section 547.030; State v. Crocker, Mo., 275 S.W.2d 293, 297 [3]. The point in the motion for new trial and in the brief must be based upon objections made and the reasons assigned at the time the error occurs. State v. Slaten, Mo., 252 S.W.2d 330 [3]; State v. Washington, Mo., 320 S.W.2d 565 [8]. We have examined the forty-odd pages of this cross-examination and, as we read the transcript, the court, upon proper

objection, was restricting the cross-examination to matters falling within the direct examination of defendant. The contention is overruled.

IX. During the examination of Dr. Perna the prosecuting attorney asked if "the force of these bullets and these two particular wounds" would have caused Collings' body to spin to the left. Defendant's attorney stated he did not know which particular wounds were being inquired about. The court said " * * * why don't you include in the question which wounds? This case might sometime be looked at by another court." Defendant's counsel, out of the hearing of the jury, requested a mistrial on the ground the last remark of the court gave the jury the impression a verdict of guilty would be returned and the defendant would appeal. This was refused. Defendant in his brief mentions another remark made by the court in chambers and out of the presence of the jury to which no objection was and properly could not have been taken. Defendant's brief is misleading. Defendant relies on State v. Castino, Mo., 264 S.W.2d 372, 374, wherein defendant had asked a separate trial and the court informed the veniremen that the proceeding had been commenced against three defendants and one had pleaded guilty but had not been sentenced. In the instant case the court's statement was prompted by a suggestion from defendant's counsel, was addressed to the attorneys, and its purpose was to have the written record clear, which appears to have been the original purpose of defendant's attorney. The remark may not have been necessary but it was not prejudicial error. State v. Young, 105 Mo. 634, 641, 16 S.W. 408 [5]; Annotation, 132 A.L.R. 680(II, b). Consult State v. Brotherton, Mo., 266 S.W. 2d 712, 716 [5–7]; 23 C.J.S. Criminal Law § 989.

X. Defendant complains of the State's rebuttal testimony that his reputation for truth and veracity was bad. De-

fendant's authorities (26 Am.Jur., Homicide, § 342; 20 Am.Jur., Evidence, § 325, and Kirby v. State, 25 Okla.Cr.R. 330, 220 P. 74, 33 A.L.R. 1212) do not rule the issue presented. By taking the stand defendant's credibility as a witness became an issue and testimony that his reputation for truth and veracity was bad was proper in rebuttal. State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 41 [8], citing authority; State v. Kain, Mo., 330 S.W.2d 842, 845 [3]; section 546.260. That the State's witnesses were not friendly to defendant went to the credibility and weight of their testimony, not its admissibility.

■■■■■■ XI. The court submitted to the jury, among others, instructions on murder in the second degree (instruction No. 5; see section 559.020) and on manslaughter (instruction No. 6, see section 559.070). A complaint in defendant's motion for new trial common to each of said instructions is that defendant was charged with murder in the first degree and, under the evidence, was guilty of murder in the first degree or not guilty. We held supra (¶ VI) that the State made a submissible case. Furthermore, section 559.030 provides that upon a trial for murder in the first degree the jury must inquire and ascertain, under the instructions, whether defendant be guilty of murder in the first or second degree. Section 556.220 provides: " * * * and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." See also section 545.030(17); Sup.Ct.R. 26.06. The law has been changed, and the cases cited by defendant bearing on the issue (State v. Bailey, 57 Mo. 131, 133; State v. Mahly, 68 Mo. 315, 318) are no longer the law. State v. Murphy, 341 Mo. 1229, 111 S.W. 2d 132, 137 [18–20], and authorities cited. In addition, having been convicted of manslaughter, defendant may not successfully assert prejudicial error in an instruction submitting a higher degree of the offense

on trial whether such instruction be right or wrong. State v. Foster, 355 Mo. 577, 197 S.W.2d 313, 319 [12]; State v. Nolan, 354 Mo. 980, 192 S.W.2d 1016, 1022 [15]; State v. Goodwin, 271 Mo. 73, 195 S.W. 725, 729 [9].

■■■■ XII. The court instructed on self-defense. The instruction on manslaughter (No. 6) defined "manslaughter" as the "killing of a human being not herein declared to be murder or excusable or justifiable homicide" (section 559.070) and then required the jury to find facts and circumstances requisite to a finding of guilt of manslaughter, specifically excluding excusable or justifiable homicide and a finding that the killing was not in the lawful defense of defendant's person. The instruction then defined "excusable homicide" as "the accidental killing of another" (section 559.-050), and "justifiable homicide" in the language of section 559.040(1, 2, 3). Defendant says said instruction "is erroneous in that it couples the crime of manslaughter with excusable homicide and three degrees of justifiable homicide," which is alleged to confuse a jury to such an extent "that they could not return a verdict based upon the testimony adduced." Before the jury could find defendant guilty of manslaughter under the instruction it was required to find, so far as involved in defendant's complaint, that the killing was not the result of an accident (excusable homicide) or the result of any of the situations set forth in section 559.040 (justifiable homicide). It authorized an acquittal of manslaughter if any of the submitted factual situations were found by the jury whether or not the evidence was sufficient to support such a finding. All this put a greater burden on the State than was required of an instruction restricted to the defenses of excusable or justifiable homicide within the evidence, and the error being in favor of defendant, he was not prejudiced and is in no position to complain on the grounds assigned. Consult State v. Farrell, 320 Mo. 319, 6 S.W. 2d 857, 859 [7, 8]; State v. Pillow, Mo., 169 S.W.2d 414, 418 [11, 12].

XIII. Defendant says reversible error was committed in not giving an instruction on and in refusing defendant's requested instruction No. 5 on the defense of defendant's home. Did defendant's testimony, the only evidence on the issue, entitle defendant to such an instruction? Sup.Ct. R. 26.02(6); section 546.070(4).

Defendant testified he intended to go to Iowa that day and had promised to take Collings to Columbia. He took his automatic pistol from upstairs and placed it on the dining room table. This, he said, was his custom so that the gun would be there when he returned at night. Collings, after complying with defendant's request to show Beavers and Hayman what to do at the barn, was entitled to return to obtain his suitcases which were in defendant's house. Defendant testified as follows: While in the kitchen he saw Collings through the glass of the kitchen door on the back porch. Collings had the hammer and said: "I am coming in and kill you, you son-of-a-bitch." He told Collings to stop but Collings came into the kitchen, smashing the door with the hammer and breaking the glass. Defendant then went into the dining room, a distance of about twelve feet, and got his gun. He came back to a position between the dining room table and the kitchen door, and tried to get Collings, who was already in the room and who was coming at him threatening to kill him and striking at him with the hammer, to stop. Collings struck him on the wrist and swung at his head. Defendant then fired the first shot, which he thought missed. Collings then struck him on the right shoulder and defendant fired several shots in succession while Collings was still swinging at him with the hammer. Collings took two steps and fell on the kitchen floor. Defendant further testified that he "acted in self-defense"; "I know I fired because I thought it was his life or mine"; "I was excited and I was scared. I was in danger"; and "Q And after the first shot you did not retreat any further? A Oh, I don't know; I

don't suppose I did. I was firing to save my life."

The Missouri statutes provide that every homicide shall be murder in the first degree (section 559.010), or murder in the second degree (section 559.020), unless it be excusable or justifiable homicide by reason of statute or the common law (section 559.-060), and the statutes then define justifiable homicide (section 559.040) and excusable homicide (section 559.050). The statutory definition of justifiable homicide, insofar as it pertains to a dwelling house, does not include all of the common law defense of habitation. Section 559.070 provides that every killing of a human being, not declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter. The trial court instructed on manslaughter, and in doing so instructed in the terms of the statute as to what constituted statutory excusable and justifiable homicide. If defendant was entitled to an additional instruction it is because the evidence established a right to an instruction on the common law defense of habitation.

This defense at common law apparently arose as an exception to the common law duty to retreat when attacked, if feasible under the circumstances to do so, before one was justified in taking a life. Some confusion has arisen because of a too broad interpretation of the phrase, "a man's home is his castle." After reviewing the common law this court held that this maxim was a limitation on the duty to retreat. " 'When a person is attacked in his own house, he need retreat no further. Here he stands at bay, and may turn on and kill his assailant if this be apparently necessary to save his own life; nor is he bound to escape from his house in order to avoid his assailant.' 'In this sense, and in this sense alone, are we to understand the maxim that "every man's house is his castle." ' " State v. Taylor, 143 Mo. 150, 44 S.W. 785, 789. See also 26 Am.Jur. Homicide, § 155.

The principal feature of the defense of habitation, when applied to the facts of this case, is that under certain circumstances one is justified in committing a homicide to prevent an *entry* to the home or dwelling. "When an assault on a dwelling and an attempted forcible entry are made under such circumstances as to create a reasonable apprehension that it is the design of the assailant to commit a felony or to inflict on the inmates a personal injury which may result in the loss of life or great bodily harm, the danger that the design will be carried into execution being imminent and present, the lawful occupant of the dwelling may lawfully *prevent the entry*, even by the taking of the life of the intruder." (Italics added.) Vol. I, Wharton, Criminal Law and Procedure, § 220. See also the statements in 26 Am. Jur., Homicide, § 166; 40 C.J.S. Homicide § 109; and in the annotation comment and cases cited in 25 A.L.R. 508 and 34 A.L.R. 1488.

The cases where the precise issue has been raised are few. In Taylor v. State, 27 Ariz. 228, 232 P. 552, the deceased had made threats from outside the dwelling and had opened the screen and door by opening the latch in some manner. After entering the house and when about two paces inside he pushed one person aside and started on into the room and was shot by the defendant. The court held: "It is clear, however, the shot was not fired to prevent deceased from entering the house, for that he had done without meeting any physical resistance. The assault on the house was an accomplished fact, and defendant could not punish the act, however wrongful, by taking the intruder's life. * * * The shooting of deceased by defendant must be justified, if at all, as necessary or apparently necessary to protect her own life, or to protect herself from great bodily harm, and she must have acted under a reasonable apprehension that her life was in immediate danger."

In State v. Sorrentino, 31 Wyo. 129, 224 P. 420, 34 A.L.R. 1477, two boys burglariously entered a house to steal moonshine whiskey. After entering the kitchen by using a key to unlock the door they went to a bedroom and one was shot by defendant. The court stated: "A man has the right to prevent, in his home, the commission of a felony or the infliction on any of its inmates of a personal injury which may result in the loss of life or in great bodily harm. The right is limited to prevention; it does not extend to punishment for an act already committed. * * * After the deceased had entered, though burglariously, and after he was in the house, the defendant had no right to kill him for the act of entry already committed." See also Horton v. State, 110 Ga. 739, 35 S.E. 659; Carroll v. State, 23 Ala. 28, 58 Am.Dec. 282; People v. Davis, 412 Ill. 391, 107 N.E.2d 607. The applicable rule is clearly stated in Vol. I, Wharton, Criminal Law and Procedure, § 222, as follows: "A person has a right to prevent in his home the commission of a felony or the infliction on any of its inmates of an injury which may result in loss of life, or great bodily harm, but he cannot justify or excuse the slaying of a person in his house, for acts already done. When attacked in his own house, one may justify or excuse the killing of his assailant if such act is apparently necessary to save his own life or to protect himself from great bodily harm. In such case, it is the question of the law of self-defense and not the law of defense of habitation which is involved." In 40 C. J.S. Homicide § 109(c) at pp. 974–975, in discussing the nature of the intrusion of a habitation, it is stated: "A burglar may be lawfully killed by the owner of a house, where the burglar or thief is at the time committing a felony by attempting to break into and burglarize the house, or even though he is attempting to escape; but after he has entered, although burglariously, the owner has no right to kill him for the act of entry already committed."

It is apparent that the rules pertaining to the defense of habitation au-

thorize certain protective acts to be taken earlier than they otherwise would be authorized, that is, at the time when and place where the intruder is seeking to cross the protective barrier of the house. But once the intruder has crossed that barrier without resistance from the occupant of the house there is no occasion to kill him in order to keep him out because he is already in, and the occupant is not authorized by law to punish for the wrongful entry. Therefore, what protective action the occupant may take after the aggressor has effected his entry depends upon the facts and circumstances then existing, and a homicide then occurring is justifiable only under the usual rules of self-defense or to prevent therein the commission of a felony, except that there is no duty to retreat.

█ Applying these rules to the evidence in this case we find that according to defendant, Collings had threatened him from outside the house, and that defendant warned him to leave. By reason of those threats and the menacing acts of Collings defendant could reasonably have believed his life was in danger, and he could have used such force as necessary to repel Collings at the threshold of his house to *prevent an entry*. However, Collings made his entry and was inside the house before defendant sought to stop him with physical resistance. The entry was then an accomplished fact; the barrier had been crossed. Under the evidence most favorable to defendant the shooting did not occur before or while Collings was in the act of entering, and defendant did not testify or even imply that he shot Collings to prevent an entry into his house. Under the common law of the defense of habitation defendant had no right to punish deceased for the unlawful entry already completed. Collings was in defendant's house, following his forcible entry, for the stated purpose to kill defendant, and defendant affirmatively stated that the reason he intentionally shot Collings was in self-defense and to save his own life.

Defendant's right to commit a homicide when attacked in his house is governed by the law of self-defense as stated in Vol. I, Wharton Criminal Law and Procedure, § 222, supra, and in this respect the court gave an instruction on self-defense, in which the jury was told, among other things, "that the law did not require the defendant to retreat or to wait until he was actually attacked."

We need mention only briefly the cases cited and relied on by defendant. State v. Shiles, Mo., 188 S.W.2d 7, pertains to the defense of property. There the deceased and defendant engaged in an encounter in the defendant's place of business. The deceased then left but returned and made threats against defendant. The defendant shot the deceased when he "had one foot in the doorway." In State v. Taylor, 143 Mo. 150, 44 S.W. 785, the issue here presented was not involved, but the case pertained to whether one is justified in committing a homicide to prevent a mere trespass on his habitation. The shooting there took place to prevent an entry into the house, but a conviction of second degree murder was sustained. Morgan v. Durfee, 69 Mo. 469, was a civil suit. The somewhat loose language there used, which is quoted and relied on by defendant, with reference to the right of one to defend his dwelling being superior to the defense of his person, was not concurred in by any of the other members of the court. Possibly this language has reference to the exception to the duty of one to retreat under the law of self-defense when attacked in his habitation, see Carroll v. State, 23 Ala. 28, 58 Am.Dec. 282, but if so the jury was fully instructed as to this. The observations in State v. Pollard, 139 Mo. 220, 40 S.W. 949, were made in criticizing an instruction too favorable to the defendant who was charged with and found guilty of murder. No question was involved concerning the defense of habitation by the defendant, but the observations there made

are consistent with the views here expressed.

We must and do conclude that the instructions which were given submitted all the defenses to which defendant was entitled under the applicable law.

Our examination of the matters we inquire into under Sup.Ct.R. 28.02 discloses no reversible error.

The foregoing disposes of all issues for consideration on this review.

The judgment is affirmed.